IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GILBERT M. MARTINEZ,                          :
                                              :
                            Plaintiff,        :        CIVIL ACTION NO. 16-1290
                                              :
            v.                                :
                                              :
CITY OF READING PROPERTY                      :
MAINTENANCE DIVISION, READING                 :
AREA WATER AUTHORITY,                         :
                                              :
                            Defendants.       :

## MEMORANDUM OPINION

Smith, J.                                                      September 29, 2017

The *pro se* plaintiff brought this action due to the allegedly unlawful actions by the defendants, a city's property maintenance division and a municipal water authority, in regard to, *inter alia* (1) the water authority's continued acts of terminating municipal water services for his home and charging him fees for a compromised water meter and turning off and on the water, and (2) the property maintenance division condemning his property for not having running water and then issuing non-traffic citations calling for fines because of the lack of running water. Based on these purportedly wrongful acts, the plaintiff expressly asserts federal claims under 42 U.S.C. §§ 1981 and 1983, and state law claims for violations of various provisions of the Pennsylvania Utilities Code. The plaintiff also generally asserts that the defendants conspired among themselves and with a variety of other entities and individuals, including the FBI, to violate his constitutional rights in retaliation for a civil action he brought in the Eastern District of New York. Both of the defendants have filed motions for summary judgment. For the reasons discussed below, the court will grant the motions.

# I. ALLEGATIONS AND PROCEDURAL HISTORY

On March 18, 2016, the *pro se* plaintiff, Gilbert M. Martinez ("Martinez"), filed an application to proceed *in forma pauperis* and a proposed complaint. Doc. No. 1. In the proposed complaint, Martinez named as defendants the Honorable Madelyn J. Fudeman (in her individual and official capacities), the City of Reading Property Management Division ("PMD"), and the Reading Area Water Authority ("RAWA"). He asserts that

> [t]his is a civil action seeking injunction [sic] relief, monetary relief, including past and ongoing economic loss, compensatory and punitive damages, disbursements, costs and fees for violations of rights, brought pursuant to [T]itle VII of the Civil Rights Act of 1964 (as amended)[,] 42 USC 2000e[,] 42 USC 1981, 1983, 18 USC 241, 242[,] First, Second, Fourth, Fifth, Seventh, Eight[h,] and Fourteenth [A]mendments.
>
> . . .
>
> This court's jurisdiction is invoked pursuant to 53 Pa[.]C.S.A. § 5607 Municipal Authorities Act, 53 P.S. § 3102 Water Service Act, 73 P.S. § 201 Unfair Trade Act, and the Supremacy Clause Article VI Section II of the United States Constitution because the defendants are persons acting under color of law within the meaning of 1983.

Complaint at 1 (alterations to original).

Martinez alleges that in October 2013, he contacted RAWA after noticing an increase in his water bill. *Id.* at ¶ 3. Although RAWA offered to change Martinez's meter for him, he rejected the request. *Id.* RAWA then, through threats and intimidation, insisted that Martinez provide it with access to change the meter. *Id.*

On October 8, 2013, RAWA gave Martinez notice that it would terminate his water service in five days because of his non-compliance. *Id.* at ¶ 4. It appears that RAWA turned off Martinez's water service and then charged him $112 for the turn-off.[1] *Id.* at ¶ 5. RAWA then

---

[1] Martinez does not specifically allege that RAWA turned off his water at this point, but the court has inferred that RAWA terminated his water service because of the reference to the turn-off fee.

doubled this fee after falsely alleging that it found Martinez's water running three days later. *Id.* at ¶ 5.

RAWA sent the PMD to Martinez's home and, apparently, the PMD condemned the home and ordered him to vacate the premises.[2] *Id.* at ¶ 6. The PMD then summoned Martinez to court to "further attempt to unlawfully take plaintiff [sic] for fines nearing six hundred dollars for having no running water on two separate occasions." *Id.*

RAWA continued to harass Martinez for turn-off fees, and in March 2014, it increased the turn-off fees to $345. *Id.* at ¶ 7. It also sent a ten-day turn-off notice to Martinez. *Id.* Despite receiving $268 from Martinez to avoid another cessation of his water services, RAWA terminated his water services on March 28, 2014, and Martinez did not have running water at his property for approximately eight months thereafter. *Id.* at ¶ 8. Although Martinez did not have running water in his home during this period, RAWA continued to charge him for water consumption and a monthly service fee of $45. *Id.*

Apparently, at some point RAWA replaced the water meter in Martinez's home, but it "refused to calibrate the meter upon [his] request to cover-up all overpaid water consumption charges." *Id.* at ¶ 9 (alteration to original). An attorney for RAWA then "trumped up bogus charges nearing 1,300 dollars." *Id.* In addition, "[t]he City of Reading then fraudulently placed [a] lien on plaintiffs [sic] home for trash collection charges that were paid to them." *Id.* (alteration to original).

At this point, Martinez alleges that Judge Fudeman became involved in a conspiracy with RAWA and PMD to violate his rights. *Id.* at ¶ 10. In particular, Judge Fudeman required him to pay "an excessive collateral" of $500 to restore his water despite knowing of his lack of financial

---

[2] The PMD also "demand[ed] 150 d0llars [sic] to remove the sticker from plaintiffs [sic] door." Complaint at ¶ 6. Martinez does not state why the sticker was on the door, although the sticker apparently related to the habitability of the home and would seem to relate to condemnation.

means.  *Id.*  Also, in April 2014, Judge Fudeman, "to increase the cost of litigation with intent to cover-up defendants['] fraudulent acts, entered an order forcing plaintiff to arbitrate."  *Id.* at ¶ 11 (alteration to original).  Judge Fudeman did this to "deprive [him] of a public trial violating the Federal Arbitration Act."  *Id.* at ¶ 12 (alteration to original).

The arbitration was later canceled to allegedly prevent Martinez from "follow[ing] through with an appeal."  *Id.* at ¶ 13 (alteration to original).  Martinez then attempted to get a scheduling order, but Judge Fudeman "in a malicious cover-up ordered arbitration."  *Id.*  Judge Fudeman ordered the arbitration to "delay and prolong[] the case from reaching the merits."  *Id.* at ¶ 14 (alteration to original).

On or around January 2016, Martinez became aware that Met-Ed, an entity that he previously sued, had been overcharging him for rates of consumption and underpaying "PCAP rates as contracted by the Public Utility Commission."  *Id.* at ¶ 15.  After Martinez filed an informal complaint with Met-Ed, the defendants again began to harass him "through unlawful turn-offs, thus demanding access to [his] home to change their meter that was not in need to be changed[.]"  *Id.* at ¶ 16 (alteration to original).  RAWA also again terminated his water service and charged him for the turn-off.  *Id.*

Martinez filed an informal complaint on March 4, 2016, and the defendant, "without resolving the complaint[,] terminated water services violating unauthorized termination for Public Utilities and Winter Termination Procedures."[3]  *Id.* at ¶ 17 (alteration to original).  Martinez then filed an order to show cause to stop the proposed termination of water services, but the court refused to sign the order and, as such, deprived him of a hearing.  *Id.* at ¶ 18.

---

[3] It appears that Martinez is referring to RAWA here, but he does not identify the defendant involved in the complaint.

Martinez appeared before Judge Fudeman on an emergency motion (that he apparently filed) on March 12, 2016. *Id.* at ¶ 19. Martinez claims that Judge Fudeman deprived him of an evidentiary hearing and "therefore authorized and consented to defendant terminating water services." *Id.* Judge Fudeman "also attempted to force [him] into a[n] agreement with defendant under duress, [and] stated 'If I grant you a hearing it wouldn't be heard forweeks [sic] which would leave you without water until then.'" *Id.* (alterations to original).

Martinez "was forced to file" a second emergency motion and there was a hearing on March 15, 2016. *Id.* at ¶ 20. During this hearing Judge Fudeman allegedly "by and through coercion" precluded Martinez's attempt to introduce audio recordings as evidence "and threatened and intimated [him] with an indictment for unlawful wiretaps." *Id.* (alteration to original). Martinez believed that the audio tapes "were legally obtained in full accordance with the law." *Id.* During the hearing, Judge Fudeman also deprived him of his right to cross-examine the defendants' witnesses after their attorney introduced a "fraudulent document as evidence." *Id.* at ¶ 21. Judge Fudeman then abruptly terminated the hearing, resulting in Martinez remaining without water. *Id.*

On March 16, 2016, the PMD placed a sticker on the door of Martinez's home. *Id.* at ¶ 22. The sticker informed Martinez that he had to vacate the premises for the unlawful turn-offs. *Id.* Martinez claims that this happened on "multiple occasions." *Id.*

Based on the aforementioned allegations, Martinez seemingly asserts three general causes of action. The first count of the complaint contains a purported cause of action under 42 U.S.C. § 1983 for violations of the First, Second, Fourth, Fifth, Seventh, Eighth, and Fourteenth Amendments to the United States Constitution.[4] *Id.* at 6. Martinez appears to also contend that

---

[4] The heading to Count I references only the First, Fourth, Seventh, Eighth, and Fourteenth Amendments. *See* Complaint at 6. The allegations in Count I contain references to the First, Second, Fourth, Fifth, Seventh, Eighth,

5

the defendants conspired to violate his aforementioned constitutional rights. *Id.* He further alleges that (1) the defendants "retaliate[d] against him for exercising his Freedom of speech right and right to Federal Suit[,]" (2) denied him due process of law, and (3) discriminated against him because of his "race and class in society." *Id.* (alterations to original). He claims that due to the defendants' acts he "suffered and continues to suffer fear, anxiety, physical injury, mental anguish, emotional distress, emotional pain and suffering, loss of his usefulness to the public and loss of the enjoyment of life." *Id.* at 7. He asserts that he "is now suffering and will continue to suffer irreparable injury and monetary damages as well as punitive damages and . . . is entitled to [damages] in excess of [$5,000,000]." *Id.* (alterations to original).

Count II of the complaint appears to assert a cause of action under 42 U.S.C. § 1981. *Id.* Martinez once again claims that the defendants discriminated against him "based in whole or in part [on] his race and class in society." *Id.* Thus, he asserts that they denied him his full and equal rights of the law that are given to white citizens. *Id.* Martinez asserts the same injuries and requests the same forms of relief in Count II as indicated in the first count of the complaint. *Id.* at 8.

For the third and final count of the complaint, Martinez purports to claim that the defendants violated 18 U.S.C. §§ 241 and 242 and the following sections of the Pennsylvania Administrative Code: 52 Pa. Code §§ 56.83, 56.321, 56.331, 56.334, 56.340, and 65.8. *Id.* at 9. For these alleged violations, Martinez asserts the same injuries and requests the same forms of relief in Count III as he does in the first two counts of the complaint. *Id.* at 11.

---

and Fourteenth Amendments. *Id.* For sake of completeness, and giving the complaint the most liberal interpretation possible, the court will treat the complaint as Martinez having raised claims under the First, Second, Fourth, Fifth, Seventh, Eighth, and Fourteenth Amendments.

In addition to the over $15,000,000 in requested monetary damages under the three counts in the complaint, Martinez also seeks relief in the nature of:

> d.   A declaratory [sic] stating that the defendants willfully violated plaintiff's rights secured by State and Federal laws as alleged herein.
>
> e.   Injunction Relief:  An injunction requiring the defendants to correct all past and current violations of Federal and State law as stated herein.
>
> f.   Injunction transferring Civil case no. 14-14241 from the Berks County Court of Common Pleas, incorporating it with this case.
>
> g.   A [d]eclaratory [sic] to enjoy the defendants from continuing to act in violation to Federal and State laws as stated herein; and to order such other injunctive relief as may be appropriate to prevent any further violations of said Federal and state laws.

*Id.* (alteration to original).

On July 6, 2016, this court entered an order, which, *inter alia*, (1) granted Martinez's application to proceed *in forma pauperis*, (2) dismissed with prejudice any claims for purported violations of Title VII of the Civil Rights Act of 1964 insofar as such a claim was included in the introduction of the complaint, (3) dismissed with prejudice any claims against Judge Fudeman because she was entitled to absolute judicial immunity, (4) dismissed with prejudice any claims for violations of the sections 241 and 242 of the United States Criminal Code, and (5) ordered the United States Marshal to serve the summonses and complaint upon the defendants.  Order at 1-2, Doc. No. 2.  The PMD filed an answer and affirmative defenses to the complaint on September 7, 2016.  Doc. No. 7.  RAWA filed an answer and affirmative defenses to the complaint on September 13, 2016.  Doc. No. 10.

The court held an initial pretrial conference with the parties on October 5, 2016. Doc. No. 13. On the same date, the court entered a scheduling order.[5] Doc. No. 14. On November 18, 2016, RAWA filed a motion for judgment on the pleadings. Doc. No. 16. The plaintiff filed a timely response to the motion on December 5, 2016. Doc. No. 17. The court entered an order denying without prejudice the motion for judgment on the pleadings on February 2, 2017. Doc. No. 21.

On February 16, 2017, RAWA and PMD separately filed motions for summary judgment, supporting memoranda of law, and statements of undisputed material facts.[6] Doc. Nos. 22, 23, 25, 26. The plaintiff filed a response to RAWA's motion on February 24, 2017, and a response to PMD's motion on March 9, 2017. Doc. Nos. 27, 28. The court heard oral argument from the parties on April 25, 2017.[7] Doc. No. 47. The motions are ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012)

---

[5] During the initial pretrial conference, Martinez agreed to remove Judge Fudeman (in her official and individual capacities) as a defendant and have Judge Fudeman removed from the caption. Scheduling Order at ¶ 1, Doc. No. 14.

[6] In accordance with the undersigned's policies and procedures, the defendants separately filed and served on Martinez the form notice to *pro se* litigants opposing motions for summary judgment. Doc. Nos. 24, 27.

[7] Prior to having scheduled oral argument, the parties had been proceeding as if the case was going to trial and had filed pretrial memoranda and motions *in limine*.

(quoting *Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute" (alterations to original)). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986). Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported

allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

The court "may not weigh the evidence or make credibility determinations." *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Petruzzi's IGA Supermarkets., Inc. v. Darling–Del. Co. Inc.*, 998 F.2d 1224, 1230 (3d Cir. 1993)). Instead, "[w]hen considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587 (citation omitted).

## B.    Applicable Factual Record

### 1.    Relevant Provisions of the City of Reading's Property Maintenance Code

On February 27, 2012, the Reading City Council enacted Ordinance No. 20-2012, adopting and amending the International Property Code as the official Property Maintenance Code of the City of Reading, Pennsylvania ("RPMC"). *See* Statement of Undisputed Material Facts of Def., City of Reading Prop. Maint. Div., in Supp. of its Mot. for Summ. J. ("PMD's Facts") at ¶ 1; Memorandum of Law of Def., City of Reading Prop. Maint. Div. in Supp. of its

Mot. for J. on the Pleadings[8] ("PMD Mem.") at Ex. A, Ordinance No. 20-2012 ("RPMC"); Pl.'s Concise Statement Opposing Reading Prop. Maint. Summ. for J. ("Pl.'s PMD Opp. Statement") at ¶ 1. The RPMC's purpose is to "ensure public health, safety and welfare insofar as they are affected by the continued *occupancy* and maintenance of structures and *premises*." PMD's Facts at ¶ 2; RPMC § 101.3 (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 2. The PMD has the authority to enforce the RPMC. PMD's Facts at ¶ 3; RPMC § 103; Pl.'s PMD Opp. Statement at ¶ 3.

Under the RPMC, PMD code officials have the authority to condemn properties within the City of Reading if they are found to be unsafe, unlawful, or unfit for human occupancy. PMD's Facts at ¶ 4; RPMC § 108.1; Pl.'s PMD Opp. Statement at ¶ 4. As to whether a particular structure is fit for human occupancy, the RPMC provides as follows:

> A structure is unfit for human *occupancy* whenever the *code official* finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks *ventilation*, illumination, sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the *occupants* of the structure or to the public.

PMD's Facts at ¶ 5; RPMC § 108.1.3 (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 5.

With regard to water systems, the RPMC states that

> [e]very sink, lavatory, bathtub or shower, drinking fountain, water closet or other plumbing fixture shall be properly connected to either a public water system or to an *approved* private water system. All kitchen sinks, lavatories, laundry facilities, bathtubs and showers shall be supplied with hot or tempered and cold running water in accordance with the *International Plumbing Code*.

RPMC § 505.1.[9]

---

[8] The designation of this document as a brief in support of a motion for judgment on the pleadings appear to be a typographical error as it wholly relates to the motion for summary judgment.

[9] Martinez disagrees with PMD's assertion that this provision mandates that all structures within the City of Reading be supplied with running water at all times. PMD's Facts at ¶ 6; Pl.'s PMD Opp. Statement at ¶ 6.

If a code official finds that a property should be condemned, the RPMC requires them to issue a notice of violations prior to issuing a notice informing violators that their property has been condemned and that they are required to vacate the property. PMD's Facts at ¶ 7; RPMC § 108.3; Pl.'s PMD Opp. Statement at ¶ 7. More specifically, the RPMC states that

> [w]henever the *code official* has *condemned* a structure or equipment under the provisions of this section, *a placard* notice shall be posted in a conspicuous place in or about the structure affected by such notice and served on the *owner* or the person or persons responsible for the structure or equipment in accordance with Section 107.3. If the notice pertains to equipment, it shall also be placed on the *condemned* equipment. The notice shall be in the form prescribed in Section 107.2.

PMD's Facts at ¶ 7; RPMC § 108.3 (alteration to original) (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 7.[10]

Regarding placarding, the RPMC provides for the placarding of condemned properties for failure to comply with its requirements as follows:

> Upon failure of the *owner* or person responsible to comply with the notice provisions within the time given, the *code official* shall post on the *premises* or on defective equipment a placard bearing the word "Condemned" and a statement of the penalties provided for occupying the *premises*, operating the equipment or removing the placard.

PMD's Facts at ¶ 8; RPMC § 108.4 (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 8.

---

[10] Section 107.2 of the RPMC provides as follows:

> Such notice prescribed in Section 107.1 shall be in accordance with all of the following:
>   1. Be in writing.
>   2. Include a description of the real estate sufficient for identification.
>   3. Include a statement of the violation or violations and why the notice is being issued.
>   4. Include a correction order allowing a reasonable time to make the repairs and improvements required to bring the *dwelling unit* or structure into compliance with the provisions of this code.
>   5. Inform the property *owner* of the right to appeal *as per Section 111.1*.
>   6. Include a statement of the right to file a lien in accordance with Section 106.3.

RPMC § 107.2 (emphasis in original). In addition, Section 107.3 of the RPMC provides for the method of service of the notice in pertinent part as follows: "1. Delivered personally; 2. Sent by certified/first-class mail or email addressed to the last known address; or 3. If the notice is returned showing that the letter was not delivered, a copy thereof shall be posted in a conspicuous place in or about the structure affected by such notice." RPMC § 107.3.

The RPMC provides for the procedure for removal of a placard as follows:

> The *code official* shall remove the condemnation placard whenever, **upon inspection**, the defect or defects upon which the . . . placard . . . was based have been eliminated **and with the receipt of payment in accordance with the fee schedule duly adopted by the City of Reading.** Any person who defaces or removes a condemnation placard without the approval of the *code official* shall be subject to the penalties provided by this code.

PMD's Facts at ¶ 9; RPMC § 180.4.1 (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 9.

City of Reading residents have the right to appeal decisions issued by PMD pursuant to its enforcement authority under the RPMC to a board of appeals within 20 days:

> Any person directly affected by a decision of the *code official* or a notice or order issued under this code, **including an emergency order requiring immediate evacuation of all occupants that is issued under this code,** shall have the right to appeal to the board of appeals, provided that a written application for appeal is filed within 20 days after the day of the decision, notice or order was served. An application for appeal shall be based on a claim that the true intent of the code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means**, except that an appeal of an emergency order requiring evacuation shall be based on a claim that there is no competent evidence that a true threat to safety existed during any period that any occupants were required to vacate their dwelling.**

PMD's Facts at ¶ 10; RPMC § 111.1 (emphasis in original); Pl.'s PMD Opp. Statement at ¶ 10.[11]

After the board of appeals renders a decision, an aggrieved party has the right to seek judicial review:

> Any person, whether or not a previous party of the appeal, shall have the right to apply to the appropriate court for a writ of certiorari to correct errors of law. Application for review shall be made in the manner and time required by law following the filing of the decision in the office of the chief administrative officer.

PMD's Facts at ¶ 11; RPMC § 111.7; Pl.'s PMD Opp. Statement at ¶ 11.

---

[11] The RPMC also provides that "[a]ppeals of notice[s] and orders (other than *Imminent Danger* notices) shall stay the enforcement of the notice and order until the appeal is heard by the appeals board. RPMC § 111.8 (alteration to original).

## 2. Martinez and RAWA

In 2010, Martinez purchased residential property located at 1706 Cotton Street, Reading, Pennsylvania (the "Property"). PMD's Facts at ¶ 12; PMD Mem. at Ex. B, Transcript of Oral Dep. of Gilbert M. Martinez ("Martinez Dep.") at 9; Pl.'s PMD Opp. Statement at ¶ 12. Martinez has resided at the Property since the time he purchased it. PMD's Facts at ¶ 13; Martinez Dep. at 9; Pl.'s PMD Opp. Statement at ¶ 13. Since approximately 2015, Martinez's son, Elijah, has resided with him at the Property. PMD's Facts at ¶ 14; Martinez Dep. at 15; Pl.'s PMD Opp. Statement at ¶ 14.

In 1994, RAWA was organized under the Municipality Authorities Act of 1945.[12] Defendant Reading Area Water Auth.'s Concise Statement of Material Facts in Supp. of Mot. for Summ. J. ("RAWA's Facts") at ¶ 1; Defendant Reading Area Water Auth.'s Br. in Supp. of Mot. for Summ. J. ("RAWA Br.") at Ex. III, Articles of Incorporation; Plaintiff's Response and Concise Statement Opposing Def.'s Second Mot. for Summ. J. ("Pl.'s RAWA Resp.") at ¶ 1. At all times relevant to this litigation, Martinez has been a customer of RAWA, which supplies water service to the Property. *See* PMD's Facts at ¶ 15; Martinez Dep. at 17-18; Pl.'s PMD Opp. Statement at ¶ 15 ("I have always been a customer of RAWA."); *see generally* Complaint at 2-5 (discussing issues with bill payments with RAWA). Suzanne Ruotolo ("Ms. Ruotolo"), a RAWA Customer Account Manager, is familiar with Martinez's RAWA account for his address, 1706 Cotton Street, Reading, Pennsylvania. RAWA's Facts at ¶ 4; RAWA Mem. at Ex. I, Aff. of Suzanne Ruotolo ("Ruotolo Aff."); Pl.'s RAWA Resp. at ¶ 4.

---

[12] As discussed later in this opinion, RAWA asserts that the Pennsylvania Public Utility Commission ("PUC") does not regulate municipal authorities such as RAWA. RAWA's Facts at ¶ 2 & Ex. III

### 3. Conduct of the Parties Relating to the Claims in This Case

On September 12, 2013, Martinez contacted RAWA's office about his account balance.[13] RAWA's Facts at ¶ 6; Ruotolo Aff. at ¶ 4. At that time, RAWA set up an appointment with Martinez to have his water meter changed on September 16, 2013, because he had an older type of meter.[14] RAWA's Facts at ¶ 6; Ruotolo Aff. at ¶ 4. A RAWA crew went to the Property on September 16, 2013, to change the meter, but Martinez was not home.[15] RAWA's Facts at ¶ 7; Ruotolo Aff. at ¶ 5.

RAWA sent a crew to the Property on October 8, 2013, to change Martinez's water meter.[16] RAWA's Facts at ¶ 9; Ruotolo Aff. at ¶ 7. RAWA's crew was unable to change the meter and, in accordance with RAWA's procedures, Martinez received a five-day notice stating that he needed to comply (meaning, he had to let RAWA change his meter) or RAWA would

---

[13] Martinez claims that he called RAWA in October 2013, after noticing an increase in his bill. Pl.'s RAWA Resp. at ¶ 6; Affidavit of Gilbert Martinez ("Martinez RAWA Aff.") at ¶ 5, Doc. No. 28. Nonetheless, in his deposition, Martinez acknowledged that he noticed an issue in his water bill and that he contacted RAWA about that balance in September 2013. Martinez Dep. at 23-25. Martinez claimed that his water bills had been approximately $60 per month and "then suddenly they jumped to [$]110." *Id.* at 24. Martinez's water bill had four components: water, sewer, trash, and recycling. *Id.* at 23, 24. Martinez noted that the water portion of his bill is typically around $3.00. *Id.* at 19.

[14] Martinez does not dispute that RAWA made the appointment or RAWA's purported reason for the appointment; instead, he disputes that RAWA needed to change the meter and claims that RAWA needed to provide him with ten days' notice rather than the five days' notice RAWA gave him. Pl.'s RAWA Resp. at ¶ 6; Martinez RAWA Aff. at ¶ 5. During his deposition, Martinez testified that although he originally agreed that RAWA could come and change the meter, he changed his mind and told RAWA that it could not change his meter. Martinez Dep. at 25. He changed his mind because he "was being harassed and . . . threatened by the FBI. . . . [T]hey was [sic] threatening me to drop my lawsuit against the Family Court Judges." *Id.* Apparently, at this time Martinez had a lawsuit against certain family court judges from Kings County Family Court and Berks County Family Court that was pending in the Eastern District of New York. *Id.* at 25-26. Martinez noted that he was representing himself *pro se* and the litigation involved 23 defendants. *Id.* at 26. He also noted that there were illegal wiretaps on his phone and his computer. *Id.* At bottom, Martinez was concerned that with the FBI's threats, he did not want people coming into his home to check his meter and "felt that, if anything, that they might contaminate my water." *Id.* at 27.

[15] Martinez disputes this factual assertion by saying "proof required." RAWA provided proof of the statement in the nature of Ms. Ruotolo's affidavit. Although Martinez asserts that he does not recall a RAWA crew coming to his home, *see* Martinez RAWA Aff. at ¶ 6, this does not necessarily conflict with the information in Ms. Ruotolo's affidavit, which states that the crew did not find Martinez at home in any event.

[16] Although RAWA claims that Martinez called it on October 1, 2013, to make an appointment, Martinez does not recall making the appointment. RAWA's Facts at ¶ 8; Ruotolo Aff. at ¶ 6; Martinez RAWA Aff. at ¶ 8.

turn off his water.[17]  RAWA's Facts at ¶ 9; Ruotolo Aff. at ¶ 7; Pl.'s RAWA Resp. at ¶ 9;

Martinez Dep. at 28.  At some point shortly after the expiration of the five-day period, RAWA

shut off the water to the Property.[18]  RAWA's Facts at ¶ 10; Ruotolo Aff. at ¶ 8; Pl.'s RAWA

Resp. at ¶ 10; Martinez Dep. at 28-29.

In response to the water shut off, Martinez contacted RAWA on October 15, 2013, and

requested RAWA to turn on his water service.  RAWA's Facts at ¶ 11; Ruotolo Aff. at ¶ 9; Pl.'s

RAWA Resp. at ¶ 11.  At this time, Martinez would not make an appointment for RAWA to

change his water meter.  RAWA's Facts at ¶ 11; Ruotolo Aff. at ¶ 9.  Martinez asked to speak to

a supervisor at RAWA and Ms. Ruotolo called him back.  RAWA's Facts at ¶ 11; Ruotolo Aff.

at ¶ 9. Ms. Ruotolo called Martinez and he did not answer his phone.  RAWA's Facts at ¶ 11;

Ruotolo Aff. at ¶ 9. Ms. Ruotolo left a message for Martinez to call her.  RAWA's Facts at ¶ 11;

Ruotolo Aff. at ¶ 9.

On October 18, 2013, PMD received notification from the City of Reading Customer

Service Center that "water was shut off [at the Property] for noncompliance of meter change out

notice on 10/15, refusing entrance to change out the old meter – property is occupied."[19]  PMD's

Facts at ¶ 16 (alteration to original); PMD Mem. at Ex. C, Service Request Detail; Pl.'s PMD

Opp. Statement at ¶ 16.  RAWA charged Martinez a turn off/on fee for having to turn off the

water to the Property on October 21, 2013, after it determined that the water service was illegally

---

[17] The parties' dispute whether Martinez was home and whether he told the RAWA crew that they could not change his meter.  RAWA's Facts at ¶ 9; Pl.'s RAWA Resp. at ¶ 9.  Nonetheless, it is clear that Martinez received the notice.  Pl.'s RAWA Resp. at ¶ 9; Martinez Dep. at 28.

[18] RAWA claims that it turned off the water on October 15, 2013.  RAWA's Facts at ¶ 10; Ruotolo Aff. at ¶ 8.  During his deposition, Martinez asserted that RAWA turned off the water "right after the five-day notice of [his] noncompliance."  Martinez Dep. at 29.  In his response to RAWA's statement of undisputed facts, Martinez states that "RAWA did shut of [sic] the water on October 13, 2013, or before said five day notice expired."  Pl.'s RAWA Resp. at ¶ 10; *see also* Martinez RAWA Aff. at ¶ 9.  Although Martinez claims that the turn off could have occurred before the expiration of the five-day period, the record evidence supports a finding that the turn off occurred at some point after the five-day period.

[19] It appears from the Service Request Detail that "Sue Ruotolo" provided the original call to the Customer Service Center about the water shut off.  *See* PMD Mem. at Ex. C.

turned on at the Property.[20]  RAWA's Facts at ¶ 12 & Ruotolo Aff. at ¶ 10; Pl.'s RAWA Resp. at ¶ 12.

On October 23, 2013, PMD placarded the Property with a condemnation notice because it lacked water service.[21]  PMD's Facts at ¶ 18; PMD Mem. at Ex. E, Service Request Detail; Pl.'s PMD Opp. Statement at ¶ 18; Martinez Dep. at 31, 32.  Apparently, later on the same date, Martinez called RAWA and asked it to come to the Property, change the water meter, and turn on the water.  RAWA's Facts at ¶ 13; Ruotolo Aff. at ¶ 11; Pl.'s RAWA Resp. at ¶ 13; Martinez Dep. at 29, 32; Martinez RAWA Aff. at ¶ 12.  Later that day, RAWA came to the Property, changed the meter, and turned on the water.[22]  RAWA's Facts at ¶ 14; Ruotolo Aff. at ¶ 12; Pl.'s RAWA Resp. at ¶ 14; Martinez Dep. at 29, 30, 31, 32; Martinez RAWA Aff. at ¶ 13.

Martinez called RAWA on November 8, 2013, about his bill.[23]  RAWA's Facts at ¶ 15; Ruotolo Aff. at ¶ 13; Pl.'s RAWA Resp. at ¶ 15.  Martinez questioned why RAWA had charged

---

[20] Martinez denies that he turned on the water.  Pl.'s RAWA Resp. at ¶ 12; Martinez RAWA Aff. at ¶ 11.  In addition, Martinez states that he never paid the turn off/on fee and tried to dispute the fee.  Martinez Dep. at 30.

[21] PMD claims that a code officer, Wilson Ayala, issued a notice of violation regarding the RPMC § 505.3 violation on October 21, 2013.  PMD's Facts at ¶ 17; PMD Mem. at Ex. D, Inspection Report.  Martinez disputes ever having received notice.  Pl.'s PMD Opp. Statement at ¶ 17.  The court notes that although PMD attaches a copy of an inspection report to its memorandum of law in support of the motion for summary judgment, there is no indication in the document that the code officer provided Martinez with notice; instead, it simply reads as an inspection report.  PMD did not include an affidavit from the code officer or other proof that the code officer actually provided the notice to Martinez.

Martinez indicated that he later removed the placard himself in approximately January 2014, despite the placard stating that if he removed it he would be subjected to prosecution.  Martinez Dep. at 31, 32.  He claims that he attempted to speak to PMD about removing the sticker, but PMD demanded $150 to remove the sticker.  *Id.* at 32.  Martinez never paid the $150.  *Id.*  Martinez did not inform PMD that RAWA had turned on the water to the Property.  *Id.* at 33.

[22] Martinez claims that RAWA should have calibrated the meter it removed from the Property and believes that it refused to do so because "they were hiding overcharged water usage from the previous two years."  Martinez RAWA Aff. at ¶¶ 14, 15; *see also* Martinez Dep. at 50-51 (describing efforts to have RAWA calibrate the meter).

[23] Martinez purports to "disagree" with this assertion in RAWA's statement of facts, but he does not specifically discuss this or point to any evidence in the record that he did not call RAWA.  Under Rule 56(c)(1), to the extent that Martinez genuinely disputed this fact, it was incumbent upon him to cite to a particular portion of the record.  Fed. R. Civ. P. 56(c).

him for two turn off/on fees.[24]  RAWA's Facts at ¶ 15; Ruotolo Aff. at ¶ 13; Pl.'s RAWA Resp. at ¶ 15.

On November 9, 2013, a non-traffic citation was issued by Magisterial District Judge Phyllis J. Kowalski, arising out of an alleged violation of RPMC § 505.3.  PMD's Facts at ¶ 19; PMD Mem. at Ex. F, Docket Entries for *Commonwealth v. Martinez*, MJ-23102-NT-0001952-2013; Pl.'s PMD Opp. Statement at ¶ 19.  Martinez challenged the citation before Magisterial District Judge Kowalski, who found him not guilty on December 17, 2013.[25]  PMD's Facts at ¶ 20; PMD Mem. at Ex. F; Pl.'s PMD Opp. Statement at ¶ 20.

Martinez called RAWA's office on January 16, 2014, claiming that he had previously filled out a complaint with it.  RAWA's Facts at ¶ 16; Ruotolo Aff. at ¶ 14; Pl.'s RAWA Resp. at ¶ 16.  RAWA had no record of having received a complaint from Martinez, so an employee asked him to fax the complaint form to the office.  RAWA's Facts at ¶ 16; Ruotolo Aff. at ¶ 14. Apparently, RAWA received a complaint from Martinez about the two turn off/on fees, because it denied the complaint on January 28, 2014, and did not provide him with relief for the two fees (totaling $224.00).[26]  RAWA's Facts at ¶ 17; Ruotolo Aff. at ¶ 15 & Ex. A; Pl.'s RAWA Resp. at ¶ 17.

---

[24] The parties appear to agree that RAWA charged Martinez two turn off/on fees, but disagree as to the bases for the fees.  RAWA's Facts at ¶ 15; Ruotolo Aff. at ¶ 13; Pl.'s RAWA Resp. at ¶ 15.  Martinez claims that RAWA charged him fees for (1) noncompliance of the meter change, and (2) him allegedly turning on the water.  Pl.'s RAWA Resp. at ¶ 15; Martinez RAWA Aff. at ¶ 16.  RAWA asserts that it charged him when (1) it determined on October 21, 2013, that the water was turned on for the Property, and (2) it turned on the water on October 23, 2013.  RAWA's Facts at ¶ 15; Ruotolo Aff. at ¶ 13.

[25] Martinez agrees that all of the transactions or occurrences regarding the 2013 condemnation of the Property and the citation occurred more than two years before he filed this lawsuit on March 18, 2016.  PMD's Facts at ¶ 21; Pl.'s PMD Opp. Statement at ¶ 21.

[26] Martinez's complaint form, which is attached to the denial letter, is dated December 2, 2013.  *See* Ruotolo Aff. at Ex. A.  The denial letter also contained RAWA's documentation in support of the denial.  *Id.*

On February 5, 2014, RAWA sent Martinez's account to a collection agency because of nonpayment on the account.[27]  RAWA's Facts at ¶ 18; Ruotolo Aff. at ¶ 16 & Ex. B, Account Statement; Pl.'s RAWA Resp. at ¶ 18.  On March 24, 2014, Martinez contacted RAWA's office and informed RAWA that he had contacted an attorney, that RAWA was not permitted to charge him for the turn off/on fees, and that he was disputing the fees.[28]  RAWA's Facts at ¶ 19 & Ruotolo Aff. at ¶ 17; Pl's RAWA Resp. at ¶ 19.

RAWA shut off water to the Property on April 8, 2014, claiming nonpayment.[29]  RAWA's Facts at ¶ 20; Ruotolo Aff. at ¶ 18; Pl.'s RAWA Resp. at ¶ 20.  Apparently, water service remained terminated for approximately eight months thereafter.[30]  PMD's Facts at ¶ 22; Martinez Dep. at 33, 34, 43; Pl.'s PMD Opp. Statement at ¶ 22.

PMD received notice from the City of Reading Customer Service Center on April 18, 2014, indicating that RAWA had terminated water service to the Property.[31]  PMD's Facts at ¶ 23; PMD Mem. at Ex. G, Service Request Detail; Pl.'s PMD Opp. Statement at ¶ 23.  On April

_____

[27] Martinez states that RAWA sent his account to collections because of the nonpayment of the turn off/on fees, *see* Martinez RAWA Aff. at ¶ 19.  According to the documentation supplied by RAWA, Martinez owed $499.00 as of January 31, 2014.  Ruotolo Aff. at Ex. B, Account Statement.

[28] Martinez claims that attorneys who were representing him at the time contacted an attorney for RAWA to tell the RAWA attorney that RAWA could not terminate Martinez's water service.  Pl.'s RAWA Resp. at ¶ 19.

[29] Martinez claims that on March 25, 2014, RAWA sent him a ten-day notice, demanding $268.77 to avoid having RAWA shut off his water again.  Martinez RAWA Aff. at ¶ 22.  Martinez asserts that he sent RAWA a payment of $280.61 via a money order on March 28, 2014.  *Id.*; Martinez Dep. at 34, 35, 36.  This payment is confirmed in Martinez's account statement.  *See* Ruotolo Aff. at Ex. B.  Martinez asserts that despite this payment, RAWA told him that he still owed $345.00.  Martinez RAWA Aff. at ¶ 23; Martinez Dep. at 35, 36.  Martinez believes that RAWA shut off the water despite receiving the payment because it was harassing him due to the lawsuits he filed "against the judges."  Martinez Dep. at 36-37.  He further noted that the FBI, City of Reading Police Department, multiple hospitals and doctors, and Met-Ed (Martinez's electricity provider) were harassing him.  Martinez Dep. at 37-41, 54-55.  Martinez believes that "everything resolved [sic] around the Family Court Case.  And it still resolves [sic] around the Family Court case."  *Id.* at 41.  Martinez also believes that RAWA and PMD are involved in the conspiracy to harass him because they are governmental entities.  *Id.* at 42-43.  Martinez has no evidence of communications between PMD and the FBI, Pennsylvania State Police, the identified doctors and hospitals that are part of Martinez's other lawsuit, the Berks County Family Court, or the Kings County Court.  *Id.* at 88-89.

[30] During this period, Martinez obtained water from his neighbor's property.  Martinez Dep. at 43, 62.

[31] PMD asserts that Vicky Hoffman, a PMD code enforcement officer, went to the Property on April 21, 2014, to issue a notice of violation that the lack of water violated RPMC § 505.1.  PMD's Facts at ¶ 24; PMD Mem. at Ex. H, Inspection Report.  Martinez does not recall Ms. Hoffman coming to the Property to issue a notice of violation.  Pl.'s PMD Opp. Statement at ¶ 24.  Similar to the October 21, 2013 notice, the April 21, 2014 "notice" is an inspection report and there is no information provided in the report from which the court can imply that Martinez received it or notice of it.  *See* PMD Mem. at Ex. H, Inspection Report.

22, 2014, PMD placed a placard notice on the front door of the Property, informing Martinez that PMD condemned the Property for his failure to comply with RPMC § 505.1.[32]  PMD's Facts at ¶ 25; PMD Mem. at Ex. I, Copy of Placard; Pl.'s PMD Opp. Statement at ¶ 25; Martinez Dep. at 67, 71-72.  As of the time of the placarding, the Property did not have running water.  PMD's Facts at ¶ 26; Martinez Dep. at 33, 34, 43, 74; Pl.'s PMD Opp. Statement at ¶ 26.

Upon seeing the condemnation placard, Martinez called PMD and spoke to someone there.  Martinez Dep. at 72.  Martinez recalls informing this person (he believes the person was a male) that PMD had no right to order him to leave his home, and the person responded by stating that Martinez needed running water to live there.  *Id.*  Martinez inquired about removing the placard, and the person informed him that it was $150 to remove the placard and the Property needed to have running water.  *Id.* at 73.  Other than this conversation, no one at PMD ever demanded that Martinez pay the $150 fee.  In addition, although the condemnation placard directed Martinez to vacate the Property, Martinez continued to reside at the Property and yet, he was not arrested or forcibly removed from the Property and no one from PMD came to the Property and directed him to leave.  Martinez Dep. at 75.  Moreover, although RPMC § 108.4.1 prohibited Martinez from removing the placard, he removed it on an unspecified date in 2014 without suffering any adverse consequences from PMD.  PMD's Facts at ¶ 32; Martinez Dep. at 79; Pl.'s PMD Opp. Statement at ¶ 33.

---

[32] The placard, *inter alia*, (1) stated that the Property was unsafe for human occupancy and/or unlawful pursuant to the RPMC, (2) directed the occupants of the Property to immediately vacate the Property, (3) stated that the Property was unlawful and in violation of RPMC § 505.1, (4) stated that occupying the Property would result in prosecution and imposition of a $300.00 to $1,000.00 fine (or up to $5,000.00 for a third or successive offense), costs and restitution, "or in default of payment to imprisonment for a term not to exceed thirty (30) days."  PMD Mem. at Ex. I, Copy of Placard (capitalization removed from quotation).

Because of the alleged violation of RPMC § 505.1, a non-traffic citation was issued on April 22, 2014, requiring Martinez to pay a fine of $579.00.[33]  PMD's Facts at ¶ 27; PMD Mem. at Ex. J, Citation; Pl.'s PMD Opp. Statement at ¶ 27.  Martinez challenged the citation before the magisterial district judge and the judge found him not guilty on June 2, 2014.  PMD's Facts at ¶ 28; PMD Mem. at Ex. K, *Commonwealth v. Martinez*, No. MJ-23102-NT-0000699-2014; Martinez Dep. at 78; Pl.'s PMD Opp. Statement at ¶ 29.  Due to the not guilty verdict, the magisterial district court dismissed the citation and did not require Martinez to pay the fine set forth on the citation.  PMD's Facts at ¶ 29; Martinez Dep. at 77; Pl.'s PMD Opp. Statement at ¶ 30.

On or July 2, 2014, Martinez notified RAWA that he was suing RAWA in the Court of Common Pleas of Berks County.[34]  RAWA's Facts at ¶ 21; Ruotolo Aff. at Ex. C, Complaint; Pl.'s RAWA Resp. at ¶ 21; Martinez Aff. at ¶ 24.  On November 10, 2014, RAWA and Martinez appeared before the Honorable Madelyn S. Fudeman.[35]  RAWA's Facts at ¶ 22; Ruotolo Aff. at ¶ 20; Pl.'s RAWA Resp. at ¶ 22; Martinez RAWA Aff. at ¶ 25.  Judge Fudeman gave Martinez ten days to provide a $500.00 down payment and then pay an average monthly bill going forward (Martinez claims it was $81.00 per month plus water usage) until his lawsuit against RAWA went to arbitration.  RAWA's Facts at ¶ 22; Ruotolo Aff. at ¶ 20; Pl.'s RAWA Resp. at ¶ 22; Martinez RAWA Aff. at ¶ 26; Martinez Dep. at 44, 45.  As part of the arrangement before

---

[33] In its statement of facts, PMD asserts that the magisterial district judge issued the citation.  PMD's Facts at ¶ 27. Although Martinez does not dispute this assertion, the court notes that the citation does not state the name of the magistrate judge, although it does indicate a magisterial district number of "23-1-2."  PMD's Facts at Ex. J.  The court also notes that it appears that Ms. Hoffman was the individual seeking the citation, and the citation includes a typewritten entry of "VIOLATION NOTICE ISSUED: 4/21/14."  *Id.*
[34] Apparently, Martinez filed the complaint on June 10, 2014.  Ruotolo Aff. at Ex. C, Complaint.  At the time, the Widener University School of Law, Harrisburg Civil Law Clinic represented Martinez.  *Id.*
[35] Martinez claims that the parties appeared before Judge Fudeman that day in response to an order to show cause as to why water service should not be restored to the Property.  Pl.'s RAWA Resp. at ¶ 22.

Judge Fudeman, RAWA agreed to turn on the water once Martinez made the $500 deposit. RAWA's Facts at ¶ 22; Ruotolo Aff. at ¶ 22; Pl.'s RAWA Resp. at ¶ 22.

Martinez paid the $500.00 on November 10, 2014, and RAWA turned on the water for the Property.[36] RAWA's Facts at ¶ 23; Ruotolo Aff. at ¶ 21; Pl.'s RAWA Resp. at ¶ 23; Martinez RAWA Aff. at ¶ 27; Martinez Dep. at 44. On November 12, 2014, Martinez asked RAWA if its meter crew would come to the Property to "reposition" his meter so that he could read it on his own. RAWA's Facts at ¶ 24; Ruotolo Aff. at ¶ 22 & Ex. D; Pl.'s RAWA Resp. at ¶ 24; Martinez RAWA Aff. at ¶ 28.

With regard to Martinez's state court cause of action against RAWA, Judge Fudeman held a hearing on December 23, 2014. RAWA's Facts at ¶ 25; Ruotolo Aff. at ¶ 23 & Ex. E, Docket Sheet, *Martinez v. Reading Area Water Auth.*, No. 14-cv-14241. Judge Fudeman ordered that the case would proceed to arbitration.[37] RAWA's Facts at ¶ 25; Ruotolo Aff. at ¶ 23; Pl.'s RAWA Resp. at ¶ 25; Martinez Dep. at 46.

RAWA asserts that on February 11, 2016, the meter at the Property indicated a reverse read and RAWA generated a work order to have the meter checked.[38] RAWA's Facts at ¶ 26; Ruotolo Aff. at ¶ 24 & Ex. F; Pl.'s RAWA Resp. at ¶ 26. On February 29, 2016, RAWA issued a five-day notice at the Property to have RAWA check the meter or it would terminate water

---

[36] Martinez indicated that the court held the $500 deposit. Martinez Dep. at 44, 45-46.

[37] It appears from the docket sheet and documentation submitted by Martinez that an arbitration award was entered in the amount of $2,189.39 on November 7, 2016, without Martinez having been present. RAWA's Facts at ¶ 25; Ruotolo Aff. at ¶ 23 & Ex. E, Docket Sheet; Pl's RAWA Resp. at ¶ 25; Martinez RAWA Aff. at Ex. B, Doc. No. 28-1 at ECF p. 2. The docket entries reflect that the arbitration hearing was continued on possibly two occasions, and that Martinez had twice appealed orders entered in the case. Ruotolo Aff. at Ex. E, Docket Sheet. It is unclear if the appeals affected the rescheduling of the arbitration hearings. Nonetheless, Martinez claims that he did not receive notice of the November 7, 2016 arbitration hearing because notice was "wrongly" sent to an attorney that was no longer representing him. Pl.'s RAWA Resp. at ¶ 25.

[38] The court recognizes that Martinez disputes that there was a reverse read and attempts to show a photo of the meter taken on March 15, 2016 to dispute this claim. Pl.'s RAWA Resp. at ¶ 26. The photograph is unreadable. *See* Doc. No. 28-1 at ECF p. 6. Even if it was readable, it is not a photo of the water meter on February 11, 2016. Martinez also asserts that he spoke to an employee at RAWA named "Brett," who told him that the reason RAWA needed to test the meter related to a backflow preventer. Pl.'s RAWA Resp. at ¶ 26. Regardless of whether it was an actual reverse read, RAWA appears to have acted as if it had a reverse read.

service.[39]  RAWA's Facts at ¶ 28; Ruotolo Aff. at ¶ 26 & Ex. H; Pl.'s RAWA Resp. at ¶ 28;

Martinez RAWA Aff. at ¶ 31.  On that same date, Martinez called RAWA's office about the

five-day notice, but he refused to make an appointment, stating that RAWA was misleading him

and that nothing was wrong with his water meter.[40]  RAWA's Facts at ¶ 29; Ruotolo Aff. at ¶ 27;

Pl.'s RAWA Resp. at ¶ 29; Martinez RAWA Aff. at ¶ 32.

Martinez served RAWA on March 1, 2016, with paperwork indicating that an emergency

hearing would occur on March 9, 2016, to stop RAWA from terminating his water service.

RAWA's Facts at ¶ 30; Ruotolo Aff. at ¶ 28 & Ex. I, Ex Parte Motion to Show Cause, *Martinez

v. Reading Area Water Auth.*, No. 14-cv-14241; Martinez RAWA Aff. at ¶ 33; Martinez Dep. at

47.  On March 9, 2016, RAWA appeared for the emergency hearing, but Martinez did not

appear.[41]  RAWA's Facts at ¶ 31; Ruotolo Aff. at ¶ 29; Pl.'s RAWA Resp. at ¶ 31; Martinez

RAWA Aff. at ¶ 35.

RAWA then went to the Property on March 10, 2016, but Martinez would not let

RAWA's crew inside the Property to inspect the meter.  RAWA's Facts at ¶ 32; Ruotolo Aff. at

¶ 30; Pl.'s RAWA Resp. ¶ 32; Martinez RAWA Aff. at ¶ 35.  RAWA then terminated water

---

[39] The notice stated that "[y]our water service with be **SHUT-OFF** in (5) Five Days for Non-Compliance with the notices you had received from the Reading Area Water Authority requesting to gain access into the property to change / check the water meter." Ruotolo Aff. at Ex. H.  The notice also informed Martinez that "[i]n the event that your water service has been shut-off or to find information on how to prevent the scheduled shut-off, contact the Reading Area Water Authority at 610-406-6318." *Id.*  It further stated that "[f]ailure to comply will cause shut-off of water service and a charge of $112.00 to have the water service restored."  *Id.*
    In addition, the court notes the following conflicting statements by Martinez.  During his deposition, Martinez testified that he received a 15-day notice in February 2016, that his meter needed to be checked.  Martinez Dep. at 46.  Yet, in his response to RAWA's statement of undisputed facts, Martinez denies receiving a 15-day notice or that it was a "15 day" notice.  *See* RAWA's Facts at ¶ 27; Ruotolo Aff. at ¶ 25; Pl.'s RAWA Resp. at ¶ 27. Despite Martinez's claim to the contrary, the document clearly states that "REPAIRS ARE TO BE MADE WITHIN 15 DAYS OF THIS NOTICE BY THE CUSTOMER OR WATER WILL BE TERMINATED."  Ruotolo Aff. at Ex. G.
[40] Martinez claims that RAWA lacked probable cause to enter his premises, considering that it had changed the meter in 2013 and it was providing him with different explanations as to why it had to change the meter.  Martinez Dep. at 47.
[41] Martinez claims that he did not appear because he "was not notified by the court of an order to appear for the hearing."  Pl.'s RAWA Resp. at ¶ 31.  As another matter of conflicting evidence, Martinez testified at his deposition that he did appear for the hearing and these errors denied him due process.  Martinez Dep. at 47; *see also*

service to the Property. RAWA's Facts at ¶ 32; Ruotolo Aff. at ¶ 30; Pl.'s RAWA Resp. at ¶ 32; Martinez RAWA Aff. at ¶ 35.

Martinez and RAWA then appeared for an emergency meeting before Judge Fudeman on March 11, 2016, during which Martinez agreed to allow RAWA to inspect his meter at 3:00 p.m. that day. RAWA's Facts at ¶ 34; Ruotolo Aff. at ¶ 32; Pl.'s RAWA Resp. at ¶ 34; Martinez RAWA Aff. at ¶ 37; Martinez Dep. at 48. A RAWA crew went to the Property at 3:00 p.m., but Martinez (who was home) would not answer his door and, as such, water service remained off for the Property.[42] RAWA's Facts at ¶ 35; Ruotolo Aff. at ¶ 33 & Ex. J; Pl.'s RAWA Resp. at ¶ 35; Martinez RAWA Aff. at ¶ 39; Martinez Dep. at 48.

In addition to RAWA's actions on March 10th and 11th, PMD received notice on March 10, 2016, from the City of Reading Customer Service Center that the Property was "[o]ccupied and water is shut off." PMD's Facts at ¶ 33; PMD Mem. at Ex. L; Pl.'s PMD Opp. Statement at ¶ 34. After PMD did not receive notice that water service had resumed at the Property, PMD placarded the Property on March 16, 2016.[43] PMD's Facts at ¶ 35 & Ex. N, Copy of Placard; Pl.'s PMD Opp. Statement at ¶ 36; Martinez Dep. at 68. At this time, the Property lacked water service.[44] PMD's Facts at ¶ 36; Martinez Dep. at 81; Pl's PMD Opp. Statement at ¶ 37. Martinez did not receive a citation arising out of this placarding. PMD's Facts at ¶ 37; PMD Mem. at Ex. O, Docket Search Results; Pl's PMD Opp. Statement at ¶ 38. Other than the placard indicating that Martinez needed to immediately vacate the Property, he was never asked

---

[42] Martinez claims that he did not allow RAWA to enter the Property because Judge Fudeman purportedly refused to hold an evidentiary hearing and "wouldn't hear the merits about the misleading information they were stating as an excuse to again illegally gain access to a new meter that was recently installed." Pl.'s RAWA Resp. at ¶ 34. He claims that he appeared before Judge Fudeman again on March 15, 2016, seeking an emergency order. *Id.* Judge Fudeman held a hearing, but Martinez claims that the judge committed numerous prejudicial errors during the hearing. *Id.*

[43] This placard contained the same notices and warnings as the prior placard, but it also indicated that the Property was in violation of RPMC §§ 108.1.3 and 505.1. PMD Mem. at Ex. N.

[44] Once again, Martinez obtained water from his neighbor during the period that the Property lacked water. Martinez Dep. at 83.

by PMD to leave the Property and was not arrested or forcibly removed from the Property. PMD's Facts at ¶ 38; Martinez Dep. at 82; Pl.'s PMD Opp. Statement at ¶ 39. PMD did not demand that Martinez pay a fee or fine and Martinez did not pay a fee or fine arising out of this placarding.[45] PMD's Facts at ¶ 39; Martinez Dep. at 84, 85; Pl.'s PMD Opp. Statement at ¶ 40.

On May 8, 2016, Martinez called RAWA to have RAWA resume water service for the Property. RAWA's Facts at ¶ 36; Ruotolo Aff. at ¶ 34; Pl.'s RAWA Resp. at ¶ 36; Martinez Aff. at ¶ 41; Martinez Dep. at 48-49. RAWA told him that for it to turn on the water, he had to allow RAWA into the Property to check the meter. RAWA's Facts at ¶ 36; Ruotolo Aff. at ¶ 34; Pl.'s RAWA Resp. at ¶ 36; Martinez Dep. at 48-49. Martinez agreed to allow RAWA to check his water meter. RAWA's Facts at ¶ 36; Ruotolo Aff. at ¶ 34; Pl.'s RAWA Resp. at ¶ 36.

On May 18, 2016, a RAWA crew changed the meter at the Property and resumed water service there. RAWA's Facts at ¶ 37; Ruotolo Aff. at ¶ 35; Pl's RAWA Resp. at ¶ 37; Martinez Dep. at 49, 50. RAWA sent a notice dated May 19, 2016 to Martinez in which it stated that it found the old meter had been "compromised."[46] Martinez RAWA Aff. at ¶ 43 & Ex. G. RAWA charged Martinez a tampering fee of $560.00. RAWA's Facts at ¶ 38; Ruotolo Aff. at ¶ 36; Martinez RAWA Aff. at Ex. G; Pl.'s RAWA Resp. at ¶ 38. Martinez denies tampering with or compromising the water meter. Martinez Dep. at 49-50.

Martinez acknowledges that accurate water meters are essential for both RAWA and its customers. RAWA's Facts at ¶ 40; Ruotolo Aff. at ¶ 38; Pl.'s RAWA Resp. at ¶ 40. RAWA has policies and procedures regarding maintenance and inspection of RAWA meters, which are in

---

[45] PMD never placarded the Property or issued a citation at any time when the Property was equipped with running water. PMD's Facts at ¶ 40; Martinez Dep. at 86; Pl.'s PMD Opp. Statement at ¶ 41.

[46] RAWA contends that its crew found that the meter had been installed backward and was missing a seal. RAWA's Facts at ¶ 37; Ruotolo Aff. at ¶ 35. Martinez disputes this assertion insofar as he did not receive notice of these issues and claims that the photographs RAWA provided to him in support of their claim did not show those issues and, even if they did, there was no way for him to know that was his old water meter. Pl.'s RAWA Resp. at ¶ 37.

place to protect both RAWA and its customers. RAWA's Facts at ¶ 40; Ruotolo Aff. at ¶ 38; Pl.'s RAWA Resp. at ¶ 40.

Martinez has been consistently uncooperative with RAWA regarding his water meter.[47] RAWA's Facts at ¶ 41; Ruotolo Aff. at ¶ 39; Pl.'s RAWA Resp. at ¶ 41. Martinez has, at a minimum, been occasionally delinquent with his RAWA bills.[48] RAWA's Facts at ¶ 42; Ruotolo Aff. at ¶ 40; Pl.'s RAWA Resp. at ¶ 42; Martinez RAWA Aff. at ¶ 45. Martinez's current RAWA balance is $2,454.66. RAWA's Facts at ¶ 43; Ruotolo Aff. at Ex. L; Pl.'s RAWA Resp. at ¶ 43.

## C.    Analysis

### 1.    PMD's Motion for Summary Judgment

In PMD's motion for summary judgment, it raises numerous arguments in support of its contention that the court should grant summary judgment in its favor as to all of Martinez's claims in this case. Those arguments are as follows: First, PMD asserts that it is not a "person" subject to suit under section 1983 because it is merely an administrative department of the City of Reading. *See* PMD Mem. at 7-8. Second, PMD claims that Martinez has failed to produce evidence of any unlawful policy, practice, or custom from which a reasonable fact-finder could find it liable under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). *Id.* at 8-9. Third, PMD asserts that the statute of limitations bars Martinez's section 1983 claims to the extent they relate to PMD's placarding of the Property and the issuance of a citation in 2013. *Id.* at 10-11. Fourth, PMD contends that Martinez has failed to introduce any evidence to support a claim that PMD violated his rights under the First, Second, Fourth, Fifth, Seventh, Eighth, and Fourteenth Amendments. *Id.* at 11-29. Fifth, PMD asserts that Martinez cannot

---

[47] Martinez asserts that he has been uncooperative due to RAWA's unlawful practices. Pl.'s RAWA Resp. at ¶ 41.
[48] RAWA asserts that Martinez has been "consistently delinquent" with payments, and it appears that Martinez denies the "consistently" allegation.

prevail on his cause of action under 42 U.S.C. § 1981 because it does not provide an avenue for relief insofar as section 1983 is the exclusive means for pursuing a claim against a state actor such as PMD. *Id.* at 29-30. Sixth, PMD contends that Martinez has introduced no evidence to support his general conspiracy claims. *Id.* at 30-37. Seventh, PMD claims that Martinez may not maintain his claims in Count III of the complaint based on purported violations of the Pennsylvania Administrative Code because PMD is not subject to the referenced code provisions. *Id.* at 38. Finally, PMD contends that Martinez cannot recover punitive damages against it as a matter of public policy. *Id.* at 39-40.

Although Martinez filed a response to PMD's motion for summary judgment and statement of undisputed material facts, he did not directly address most of the legal arguments in PMD's brief. *See* Pl.'s PMD Opp. Statement at 3-4. Instead, he only claims as follows: First, he argues that he has stated a valid Eighth Amendment claim because the fines imposed were so harsh and excessive that they violated the Eighth Amendment. *Id.* at 4. Second, he believes that he has established that PMD was part of a conspiracy to violate his constitutional rights because there was information available on the internet showing that the FBI was threatening him. *Id.* Third, he asserts that he can prove that PMD violated his due process rights "because clearly they acted without authority of state or federal law and contrary to their own municipal code." *Id.* Finally, he "disagree[s] with [PMD's] assertion that the statute of limitations bars claims against [it] because they were still joined with RAWA in continuing harassment even after the 2013 placarding." *Id.* (alterations to original).

As discussed in more detail below, the court finds that PMD is entitled to summary judgment as to all of Martinez's claims. The court will set forth the rationale for granting summary judgment to PMD as to Counts I and II of the complaint in the next portion of the

opinion, but will discuss the motion as to Count III at the end of the opinion and in conjunction

with RAWA's motion for summary judgment as to Count III.

a.     <u>Martinez's Section 1983 Claims Against PMD</u>

42 U.S.C. § 1983 provides in pertinent part as follows:

> Every ***person*** who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983 (emphasis added).

When attempting to establish a claim under section 1983, a plaintiff must allege and

prove that a "person" deprived the plaintiff of a constitutional right while acting under color of

state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff

must allege the violation of a right secured by the Constitution and laws of the United States, and

must show that the alleged deprivation was committed by a person acting under color of state

law."). A municipality is a "person" for purposes of section 1983. *See Board of the Cty.

Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell v. New York

City Dep't of Soc. Servs.*, 436 U.S. 658, 659 (1978)). Although a municipality is a "person"

subject to suit under section 1983, "neither a State nor its officials acting in their official

capacities are 'persons' under § 1983." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71

(1989). Further, while the Supreme Court in *Will* addressed the question of whether a particular

state defendant is a "person" under section 1983, the Third Circuit and district courts in this

Circuit have determined that "a city police department is a governmental sub-unit that is not

distinct from the municipality of which it is part" and, as such, it is not a "person" subject to suit

under section 1983. *Mikhaeil v. Santos*, 646 F. App'x 158, 163 (3d Cir. 2016) (per curiam); *see*

28

*Jackson v. City of Erie Police Dep't*, 570 F. App'x 112, 114 n.2 (3d Cir. 2014) (per curiam) ("Although local governmental units may constitute 'persons' against whom suit may be lodged under 42 U.S.C. § 1983, a city police department is a governmental subunit that is not distinct from the municipality of which it is a part."); *Johnson v. City of Erie*, 834 F. Supp. 873, 878-79 (W.D. Pa. 1993) ("The City of Erie Police Department is a sub-unit of the city government and, as such, is merely a vehicle through which the city fulfills its policing functions.").

District courts have also gone beyond municipal or city police departments in determining that other arms of cities and local municipalities are not "persons" under section 1983. *See, e.g.*, *Gee v. Sabol*, No. 3:14-cv-1184, 2015 WL 5598928, at *3 (M.D. Pa. Sept. 22, 2015) ("[T]he Court notes that the York County Commissioner's Office and the York County Prison Religious Committee, *et al.*, and [sic] are not separate legal entities subject to suit under § 1983."); *Kane v. Chester Cty. Dep't of Children, Youth and Families*, 10 F. Supp. 3d 671, 686 (E.D. Pa. 2014) (dismissing plaintiff's federal and state law claims against Chester County's department of children and youth services because it did not have a legal existence separate from Chester County); *K.S.S. v. Montgomery Cty. Bd. of Comm'rs*, 871 F. Supp. 2d 389, 395 (E.D. Pa. 2012) ("It is well established that arms of local municipalities—such as county departments and agencies like [the Montgomery County Office of Children and Youth]—do not maintain an existence independent from the municipality.").

Here, Martinez knew as early as November 18, 2016, when PMD filed a motion for judgment on the pleadings, that PMD was contending that it was not a proper party in this case because it just an administrative arm of the City of Reading. *See* Memorandum of Law of Def., City of Reading Prop. Maint. Div. in Supp. of Mot. for J. on the Pleadings at 7-8, Doc. No. 16-2. When Martinez filed his response to the motion for judgment on the pleadings, he did not address this precise issue and instead noted that municipalities can generally be held liable under

section 1983 based upon *Monell*. *See* Memorandum of Law, and Attached Aff. Opposing Defs.'
Mot. for Summ. J. on the Pleadings at 3-4, Doc. No. 17. Additionally, when PMD raised this
issue in its motion for summary judgment, Martinez did not address it at all. Martinez has also
not sought leave of court to amend his complaint.

It appears from the record that PMD is merely an arm of the City of Reading. The
Ordinance itself provides that tenants and residents have the right "to report any presumed
violations of the [RPMC] to the Property Maintenance Division ("PMD") or a representative of
this Division." RPMC § 101.2.1. In addition, the authority for enforcing the RPMC lies with the
"Manager of the Property Maintenance Division." *Id.* § 103.1. Further, the RPMC provides that
the code officials, members of the board of appeal, and employees charged with enforcing the
code, are relieved of all personal liability "for any damage accruing to persons or property as a
result of an act or by reason of an act or omission in the discharge of official duties." *Id.* § 103.4.
Moreover,

> [a]ny suit instituted against any officer or employee because of an act performed
> by that officer or employee in the lawful discharge of duties and under the
> provisions of this code shall be defended by the legal representative of the
> jurisdiction until the final termination of the proceedings. The *code official* or any
> subordinate shall not be liable for costs in an action, suit of proceeding that is
> instituted in pursuance of the provisions of this code.

*Id.*

Although it appears that PMD is merely an arm of the City of Reading, the issue here is
that Martinez has not included the City of Reading as a defendant, so entering judgment in favor
of PMD on this particular issue would foreclose all of his section 1983 claims against PMD and
the City of Reading. Nonetheless, even if this court were to find that PMD is a "person" subject
to suit under 1983 or were to *sua sponte* allow Martinez to amend his complaint to substitute the
City of Reading for PMD, the court would still grant summary judgment in favor of PMD

because there is no genuine issue of material fact and PMD is entitled to judgment as a matter of

law insofar as Martinez has failed to show that a reasonable jury could find in his favor on his

*Monell* claim against PMD.

> Regarding liability of municipalities and local governments under section 1983, they
>
> > may be liable . . . if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S., at 665–683, 98 S.Ct. 2018). They are not vicariously liable under § 1983 for their employee's actions. See *id.*, at 691, 98 S.Ct. 2018; *Canton*[ *v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989);] *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases).
> >
> > > Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. *Monell*, 436 U.S., at 691, 98 S.Ct. 2018; see *id.*, at 694, 98 S.Ct. 2018. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. See *ibid.*; *Pembaur*, *supra*, at 480–481, 106 S.Ct. 1292; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). These are "action[s] for which the municipality is actually responsible." *Pembaur*, *supra*, at 479–480, 106 S.Ct. 1292.

*Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (final alteration in original) (emphasis in

original).

Under *Monell*, a plaintiff may hold a municipality liable under section 1983 only where

the plaintiff establishes that (1) the municipality had a policy, custom or practice, (2) the policy,

custom, or practice amounted to deliberate indifference to the plaintiff's constitutional rights, and

(3) the policy was the moving force behind the constitutional violation. *See Vargas v. City of*

*Philadelphia*, 783 F.3d 962, 974 (3d Cir. 2015) (citing *Monell*, 436 U.S. at 389-91). A "policy"

arises when a decision-maker possessing final authority issues an official proclamation, policy,

or edict. *Pembaur*, 475 U.S. at 481. "Customs" are practices so permanent and well settled as to

virtually constitute law. *Monell*, 436 U.S. at 691. Regardless of whether a plaintiff is seeking to impose *Monell* liability for a policy or a custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see also Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (explaining that in both methods to obtain liability under *Monell*, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

Here, Martinez has not attempted to identify any policy, practice, or custom by PMD which violated his constitutional rights. With regard to a government policy, there is no evidence in the record of a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issu[ing] an official proclamation, policy, or edict" with respect to any unlawful activities which allegedly violated Martinez's constitutional rights.[49] *Pembaur*, 475 U.S. at 481. In addition, with regard to proving an unlawful custom, Martinez has not identified any evidence in the record demonstrating that PMD has adopted an unlawful practice that is so permanent and well settled as to virtually constitute law. While the court is well cognizant of Martinez's *pro se* status and the responsibility to liberally construe *pro se* pleadings, it is not the court's responsibility to act as his attorney and create arguments on his behalf at this stage in the litigation. At bottom, Martinez has not identified any evidence in the record showing that any official in the City of Reading (much less PMD), who has the power to make policy, has

---

[49] Undoubtedly, the RPMC allows the code officers to condemn property under certain circumstances. *See* RPMC § 108. Also, the RPMC indicates that violations of the code are summary offenses. *See id.* at § 106. Merely because the RPMC authorizes PMD and its employees to take these actions does not mean that Martinez has established that PMD has an <u>unlawful</u> policy or custom with respect to whichever acts he claims are unconstitutional in this case.

affirmatively proclaimed a policy or acquiesced in a "well-settled custom."[50] *Bielevicz*, 915 F.2d

at 850. Thus, Martinez has failed to show that there is a genuine issue of material fact that would

preclude the court from granting summary judgment in favor of PMD on his section 1983 *Monell*

claim. Accordingly, the court will grant summary judgment in favor of PMD as to all of

Martinez's section 1983 claims.[51]

---

[50] The court recognizes that Martinez need not identify "the responsible decisionmaker" with his evidence.
*Bielevicz*, 915 F.2d at 850. Nonetheless, the court notes that three different members of the PMD were involved in
the three separate placarding incidents (two of which also involved the eventual issuance of citations). Martinez did
not establish that PMD had any practice, much less a practice that was "so permanent and well settled" that could
have "the force of law" and, thus, be "ascribable to municipal decisionmakers." *Id.* (citing *Anela v. City of
Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986)).

The court also recognizes that single incidents involving constitutional violations can also establish a policy
or custom provided that certain conditions are satisfied:

> A single incident violating a constitutional right done by a governmental agency's highest
> policymaker for the activity in question may suffice to establish an official policy. A single
> incident by a lower level employee acting under color of law, however, does not suffice to
> establish either an official policy or a custom. However, if custom can be established by other
> means, a single application of the custom suffices to establish that it was done pursuant to official
> policy and thus to establish the agency's liability.

*Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989) (internal citations omitted). Here, there is no evidence in
the record of the violation of Martinez's constitutional rights by PMD's highest policymaker or even that the
unidentified policymaker was involved in any of the purported violations. In addition, Martinez has not otherwise
established an unlawful custom by PMD through the actions of its employees.

[51] Because Martinez has failed to establish *Monell* liability on behalf of PMD, the court will not address the merits
of each of Martinez's constitutional claims under the First, Second, Fourth, Fifth, Seventh, Eighth, and Fourteenth
Amendments. Nonetheless, the court notes that during oral argument in this case, Martinez admitted that he did not
have any evidence to support a Second Amendment claim.

The court also notes that the statute of limitations would bar Martinez's section 1983 claim against PMD,
to the extent it was based on either the condemnation placarding that occurred in 2013 or the issuance of the citation
in 2013. In this regard, the statute of limitations for section 1983 actions "is governed by the personal injury tort law
of the state where the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). The applicable statute of
limitations for personal injury actions in Pennsylvania is two years. *Knoll v. Springfield Twp. Sch. Dist.*, 763 F.2d
584, 585 (3d Cir. 1985). While state law dictates the length of the limitations period in section 1983 actions, federal
law governs a cause of action's **accrual** date. *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 919 (3d Cir. 1991).
Under federal law, a "[section] 1983 cause of action **accrues** when the plaintiff knew or should have known of the
injury upon which [his] action is based." *Sameric Corp. of Del. v. City of Phila.*, 142 F.3d 582, 599 (3d Cir. 1998)
(emphasis added). "The cause of action **accrues** even though the full extent of the injury is not then known or
predictable." *Wallace*, 549 U.S. at 391 (emphasis added).

Here, Martinez knew that PMD had placarded the Property in October 2013, and the magisterial district
judge had found him not guilty of the citation on December 17, 2013. Martinez has appeared to argue, without
identifying the precise legal principle, that the "continuing violations doctrine" would save his claims. *See* Pl.'s
PMD Opp. Statement at ¶ 47 ("I disagree with defendants [sic] assertion that the statute of limitations bars claims
against [PMD] because they were still joined with RAWA in continuing harassment even after the 2013 placarding.
Defendant admits they placarded my property in 2016." (alteration to original)). This doctrine is an "equitable
exception to the timely filing requirement." *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995). "Thus,
'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the

b.    Martinez's Section § 1981 Against PMD

PMD argues that the court should grant summary judgment on Count II of the complaint because Martinez cannot maintain a 42 U.S.C. § 1981 claim against it as a matter of law insofar it is a municipal entity and section 1983 is the exclusive vehicle for bringing claims against a municipality.  PMD Mem. at 29-30.  Martinez has not addressed this argument.

Section 1981 provides in relevant part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

---

continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred.'"  *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (quoting *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991)). Further,

[i]n order to benefit from the doctrine, a plaintiff must establish that the defendant's conduct is "more than the occurrence of isolated or sporadic acts." *West*, 45 F.3d at 755 (quotation omitted). Regarding this inquiry, we have recognized that courts should consider at least three factors: (1) subject matter-whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency-whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence-whether the act had a degree of permanence which should trigger the plaintiff's awareness of and duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate. *See id.* at 755 n. 9 (citing *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983)). The consideration of "degree of permanence" is the most important of the factors. *See Berry*, 715 F.2d at 981.

*Id.* The Third Circuit has applied the continuing violations doctrine to actions under section 1983. *See Centifani v. Nix*, 865 F.2d 1422, 1432-33 (3d Cir. 1989) (applying continuing violations doctrine to plaintiff's procedural due process claim under section 1983).

Here, although it is unclear what Martinez is complaining of with respect to PMD, it appears that PMD's conduct in, *inter alia*, placing a condemnation placard on the Property upon it lacking water service on three occasions (in October 2013, April 2014, and March 2016) is the same type of conduct (albeit there is no evidence that the placarding was discriminatory), and when PMD sought citations on two occasions because of the lack of water.  Presuming that Martinez satisfies the first factor of the doctrine, he would still not satisfy the second because these incidents are not frequent enough and are more in the nature of isolated incidents insofar as the first two incidents occurred as much as six months apart, and almost two years elapsed between the second and third incidents.  Martinez would also not satisfy the third factor because the placarding of the Property and the issuance of the citation (and the not guilty disposition before the magisterial district judge) had a degree of permanence that would have triggered Martinez's awareness of and duty to assert his rights.

"'[T]he express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state government units.'" *McGovern v. City of Philadelphia*, 554 F.3d 114, 121 (3d Cir. 2009) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989)). "[W]hile § 1981 creates *rights*, § 1983 provides the *remedy* to enforce those rights against state actors." *Id.* (emphasis in original). Accordingly, "[w]hen a § 1981 claim is asserted against a municipality . . . § 1983 provides the exclusive remedy." *Greene v. City of Philadelphia*, No. CIV. A. 11-5356, 2012 WL 4462635 at *2 n.11 (E.D. Pa. Sept. 26, 2012) (citing *Jett*).

Based on the above, Martinez may not maintain a section 1981 claim against PMD as a matter of law. Even if he could maintain such a claim, the court would still grant summary judgment in PMD's favor insofar as Martinez failed to establish *Monell* liability by PMD.[52] *See, e.g.*, *Byrd v. City of Philadelphia*, No. CIV. A. 12-4520, 2014 WL 5780825, at *6 n.13 (E.D. Pa. Nov. 6, 2014) ("Discrimination claims under Sections 1983 and 1981 have the added requirement that a municipality will only be liable for discriminatory acts if it effectively adopted discrimination as an official policy or custom.").

c.    Martinez's Conspiracy Claims

To the extent that Martinez is asserting a conspiracy claim in this case under section 1985, PMD argues that this claim is "baseless and unsupported by any evidence in the record." PMD Mem. at 30. This court agrees.

---

[52] The court would also grant summary judgment in favor of PMD on the merits. "The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII." *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009); *see Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001) (explaining that to state a claim under section 1981, a plaintiff must allege "(1)[that plaintiff] is a member of a racial minority; (2) intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in the statute[,] which includes the right to make and enforce contracts."). Martinez, who is Hispanic, acknowledged during his deposition that he has no evidence that PMD treated him any differently than it treats White citizens. Martinez Dep. at 92-93. There is no evidence in the record that PMD intentionally discriminated against Martinez on the basis of his Hispanic race.

Although not specifically referenced by Martinez in his complaint, 42 U.S.C. § 1985(3) allows a plaintiff to bring an action for injuries caused by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To prevail in such a claim, a plaintiff must prove

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of person of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*United Bhd. of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).[53] To survive a motion for summary judgment on a section 1985(3) claim, a plaintiff first must "put forward facts that would allow a reasonable factfinder to conclude that [the defendants] formed a conspiracy to deprive him of his rights." *Estate of Olivia ex rel. McHugh v. New Jersey*, 604 F.3d 788, 802 (3d Cir. 2010).

Additionally, to the extent that Martinez is pursuing a conspiracy claim under section 1983, Martinez must establish that "two or more conspirators reach[ed] an agreement to deprive [him] of a constitutional right under of color of law." *Berrios v. City of Philadelphia*, 96 F. Supp. 3d 523, 534 (E.D. Pa. 2015) (citing *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993)). "Such a conspiracy requires a meeting of the minds." *Id.* (citing *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008)).

---

[53] The Third Circuit has recited the elements as follows:

> (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).

Thus, to prevail in a conspiracy claim under section 1983, Martinez must show:

> (1) there was a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences; (2) the purpose of the plan was to violate a constitutional right of the plaintiff; (3) an overt act resulted in an actual deprivation of the plaintiff's constitutional rights; and (4) the constitutional violation was the result of an official custom or policy of the municipality.

*Kelleher v. City of Reading*, No. CIV. A. 01-3386, 2002 WL 1067442, at *7 (E.D. Pa. May 29, 2002) (citation omitted).

"The plaintiff must present evidence of an agreement-a condition without which there could be no conspiracy-as it is 'not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism." *Swigget v. Upper Merion Twp.*, No. CIV. A. 08-2604, 2008 WL 4916039, at *3 (E.D. Pa. Nov. 17, 2008). Martinez can produce evidence of this agreement by direct or circumstantial evidence. *See, e.g.*, *Livingston v. Borough of Edgewood*, 430 F. App'x 172, 178 (3d Cir. 2011) (per curiam) (affirming decision dismissing conspiracy cause of action where the plaintiff failed to produce direct or circumstantial evidence "sufficient to a reasonable finding of conspiratorial agreement or concerted efforts among the [d]efendants") (citation omitted)); *Adams v. Teamsters Local 115*, 678 F. Supp. 2d 314, 323 (E.D. Pa. July 17, 2007) (explaining that to prove a conspiracy under section 1983, "plaintiffs had to produce either direct or circumstantial evidence that Mayor Rendell and the defendant members of Local 115 came to a meeting of the minds that the union would behave in a threatening or violent manner toward the anti-Clinton demonstrators").

Martinez's section 1983 and section 1985(3) claims fail for multiple reasons: First, Martinez has provided no evidence of an actual conspiracy between PMD and RAWA to violate

his constitutional rights.[54]  The only evidence related in the record that exists with respect to these two defendants and any "joint" activity is that it appears that upon RAWA shutting off water to the Property, RAWA would notify the City of Reading's Call Center and the Call Center would notify PMD.  PMD alleges that soon thereafter, a code officer would go to the Property and leave a notice of a violation (due to the lack of water service) and when Martinez did not fix the issue, PMD then placarded the Property with a condemnation notice.[55] Thereafter, PMD issued two citations.  To the extent that Martinez alleges that the defendants violated his constitutional rights, there is no evidence, direct or circumstantial that they reached any understanding to violate his rights.[56]  Instead, Martinez's allegations are based on pure speculation and conjecture.

Second, PMD (to the extent that it is deemed a municipality as an arm of the City of Reading) "cannot possess the required state of mind to support a § 1985(3) action." *DiBenedetto v. City of Reading*, No. CIV. A. 96-5055, 1998 WL 474145, at *11 (E.D. Pa. July 16, 1998) (Van Antwerpen, J.).  "[M]unicipalities are not capable of possessing the invidious discriminatory animus or motive required to successfully maintain an action under § 1985(3)."  *Id.* (citations and internal quotation marks omitted) (alteration to original).

Third, as already explained, PMD is entitled to summary judgment on Martinez's *Monell* claim because of the lack of evidence concerning a policy or custom, and this failure also affects his section 1983 conspiracy claim.

---

[54] As indicated earlier in this opinion, Martinez believes that RAWA and PMD are involved in an even larger conspiracy that involves the FBI, various doctors and hospitals, and even Met-Ed.  There is no evidence except for Martinez's conjecture that such a conspiracy exists.

[55] The court acknowledges that Martinez disputes that any code officers came to the Property to provide notice prior to placarding the Property.  The court references the initial visit by the code officer only to discuss the potential breadth of the parties' actions.

[56] Martinez also has no evidence with respect to any communications by PMD with the other non-named conspirators.  *See* Martinez Dep. at 88-89.

Finally, following the Third Circuit's description of the elements for a section 1985(3) claim, Martinez has not shown any racial or class-based discrimination. Martinez acknowledged during his deposition that he has no such evidence, although he believed that if he was "a white-collared White citizen that none of this stuff would be happening to me." Martinez Dep. at 92. This claim is purely speculative and insufficient to show the racial or class-based discrimination necessary to support a cause of action for a conspiracy under section 1985(3).

Accordingly, PMD is entitled to summary judgment as to Martinez's conspiracy claims under section 1983 and 1985(3).

### 4. Martinez's Claim for Punitive Damages

PMD also asserts that the court should strike any claim by Martinez for punitive damages because Martinez cannot recover punitive damages against a governmental entity under federal or Pennsylvania law. PMD Mem. at 39-40. Martinez does not address this argument.

A plaintiff may not recover punitive damages against a municipal government entity under federal law, including section 1983. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) (holding that "a municipality is immune from punitive damages under 42 U.S.C. § 1983"); *Doe v. County of Centre, Pa.*, 242 F.3d 437, 456 (3d Cir. 2001) (explaining that "[s]ince *City of Newport*, the principle that municipalities are immune to punitive damages under § 1983 has been extended to other government entities"); *Wood v. Rendell*, No. CIV. A. 94-1489, 1995 WL 676418, at *6 (E.D. Pa. Nov. 3, 1995) ("Punitive damages are not available against a municipality in § 1981 claims."). Similarly, a plaintiff may not recover punitive damages against governmental entities under Pennsylvania law. *See Feingold v. SEPTA*, 517 A.2d 1270, 1277 (1986) (agreeing with concerns set forth in *City of Newport* and concluding "that it would be inappropriate to assess punitive damages against SEPTA given its status as a Commonwealth agency."); *Township of Bensalem v. Press*, 501 A.2d 331 (Pa. Cmwlth. 1985) (prohibiting

punitive damages against a municipality). Based on the above, Martinez may not recover punitive damages against PMD as a matter of law.

### 2. RAWA's Motion for Summary Judgment

RAWA includes the following arguments in its motion for summary judgment: First, RAWA generally asserts that the court should grant summary judgment in its favor on Martinez's section 1983 cause of action because Martinez has failed to produce evidence that RAWA deprived him of a constitutional right. RAWA Br. at 6-7. Second, RAWA contends that Martinez has failed to introduce any evidence to support a claim that it violated his First Amendment rights. *Id.* at 7. Third, RAWA argues that Martinez has failed to show that it violated his Second Amendment rights because this case does not involve Martinez's right to bear arms. *Id.* at 8. Fourth, RAWA asserts that Martinez has failed to articulate how RAWA violated his Fourth Amendment rights and has introduced no evidence to support this claim. *Id.* at 8-9. Fifth, RAWA contends that Martinez may not maintain a Fifth Amendment due process claim insofar as it is not part of the federal government. *Id.* at 9. Sixth, RAWA argues that Martinez cannot establish a Seventh Amendment violation because RAWA has no ability or authority to grant or deny him a right to a jury trial, and it notes that Martinez could have obtained a jury trial in the Berks County action had he appealed from the arbitration award to the Court of Common Pleas. *Id.* at 9-10. Seventh, RAWA asserts that Martinez has failed to produce evidence supporting his Eighth Amendment claim that somehow RAWA's fees were excessive. *Id.* at 11-12. Eighth, RAWA contends that it is entitled to summary judgment on Martinez's Fourteenth Amendment claim insofar as (1) Martinez has not identified whether he is claiming that RAWA violated his right to substantive or procedural due process, (2) to the extent that Martinez is asserting a procedural due process claim he has failed to show that he was deprived of his liberty or property or that the procedures available to him at RAWA or the Court

of Common Pleas did not provide due process, (3) Martinez has not introduce any evidence to establish that RAWA acted in such an egregious manner that would support a substantive due process claim, and (4) to the extent that Martinez is asserting an equal protection claim, he has failed to introduce any evidence that RAWA treated him differently than similarly situated individuals. *Id.* at 12-14. Ninth, RAWA contends that Martinez cannot maintain a claim in Count II of the complaint insofar as he cannot bring a section 1981 claim against a state actor and must proceed under section 1983. *Id.* at 14-15. Finally, RAWA contends that it is entitled to summary judgment on Count III of the complaint because the provisions of the Public Utilities Code referenced by Martinez are inapplicable to it because the PUC does not regulate it. *Id.* at 16.

Although Martinez submitted a response to RAWA's statement of material facts, he did not submit any document in which he contested RAWA's legal arguments. Nonetheless, the court will address each of Martinez's claims against RAWA in turn.

a.   Martinez's First Amendment Claim

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. While unclear here, Martinez appears to contend that RAWA somehow violated his First Amendment right of free speech and he does not reference any of the other rights contained in the First Amendment. *See* Complaint at ¶ 2 (referencing freedom of speech). It further appears that he contends that RAWA (and PMD) retaliated against him for exercising his freedom of speech right and his right to file a federal suit.

As for these retaliation claims, the court notes that "government actions, which standing alone do not violate the constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001) (citations and internal quotation marks omitted). For Martinez to prevail on a First Amendment retaliation claim, he must show: "(1) that he engaged in constitutionally-protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004) (citations omitted).

Here, it appears that Martinez claims that he engaged in constitutionally protected conduct when he sued a variety of individuals and entities in another jurisdiction and when he posted twice on a website called RipoffReport.com. *See* Martinez Dep. at 36-42, 90. With respect to the postings on RipoffReport.com, Martinez claims that "the more [he] wrote online, the more retaliation [he] got." *Id.* at 90 (alterations to original). He further indicated that he believed that the FBI was the primary culprit in violating his free speech rights, but the other defendants also violated his free speech rights to the extent they were involved in a conspiracy with the FBI against him. *Id.*

Despite these claims, and although it is unclear exactly for which instances of speech Martinez claims he received unlawful retaliation, he has pointed to no evidence in the record that RAWA was aware of his postings on RipoffReport.com or even his other litigation at the time of the relevant acts in this case. In this regard, it is purely speculative to conclude that RAWA engaged in retaliation when it either shut off his water, requested to change his meter, or charged him turn on/off fees, refused to cancel the turn on/off fees, or committed any other conduct with respect to Martinez or the Property. Moreover, there is no evidence in the record that any of RAWA's actions in this case were the result of Martinez exercising his free speech rights. At

bottom, there is no evidence from which a factfinder could draw a reasonable inference that RAWA retaliated against him for him exercising his right to freedom of speech.[57]  Accordingly, RAWA is entitled to summary judgment on Martinez's section 1983 First Amendment claim.

b.  Martinez's Second Amendment Claim

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  "[T]he Second Amendment protects an individual right to possess a firearm unconnected to service in a militia, and to use that weapon for traditionally lawful purposes, such as self-defense within the home."  *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 358 (3d Cir. 2016) (citing *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008)).  Martinez has introduced no evidence that RAWA (or PMD) infringed upon his Second Amendment rights, and Martinez indicated during oral argument that he was withdrawing this particular claim.  Therefore, RAWA is entitled to summary judgment on Martinez's section 1983 Second Amendment claim.

c.  Martinez's Fourth Amendment Claim

The Fourth Amendment provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Martinez has never articulated how RAWA violated his Fourth Amendment rights or what or who he claims RAWA unlawfully seized.  It does not appear from the record that RAWA ever unlawfully entered Martinez's home (in fact, RAWA never entered

---

[57] Even if the court were to determine that RAWA acted unlawfully at any point during the relevant period in this case, there is no evidence that would create a reasonable inference that RAWA's actions were in retaliation to any speech by Martinez.

the home on the Property without Martinez's consent). It also does not appear that RAWA "seized" Martinez at any point in terms of restraining his liberty. Further, even though it is possible to have property seized when "there is some meaningful interference with an individual's possessory interests in that property," *see United States v. Jacobsen*, 466 U.S. 109, 113 (1984), the Fourth Amendment "does not protect possessory interests in all kinds of property," *see Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 62 n.7 (1992). Also, "[a]ccess to utility service cannot reasonably be construed as a 'personal effect' which is protected by the Fourth Amendment." *Gagliardi v. Clark*, No. CIV. A. 06-20, 2006 WL 2847409, at *14 (W.D. Pa. Sept. 28, 2016) (alteration to original). For the above-stated reasons and due to Martinez's failure to define his Fourth Amendment claim, RAWA is entitled to summary judgment on this claim.

### d. Martinez's Claim Under the Fifth Amendment

The Fifth Amendment to the United States Constitution states:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. amend. V. Martinez has yet to explain how RAWA's actions violated his rights under the Fifth Amendment. To the extent that he is alleging a due process violation, "the Fifth Amendment applies to actions of the federal government." *See B&G Constr. Co., Inc. v. Director, Office of Workers' Compensation Prog.*, 662 F.3d 233, 246 n.14 (3d Cir. 2011) (explaining differences between due process claims under the Fifth and Fourteenth

Amendments).  Since there is no evidence that RAWA is a federal actor, RAWA is entitled to summary judgment on Martinez's Fifth Amendment claim.

e.    Martinez's Seventh Amendment Claim

The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  While again unclear, Martinez's Seventh Amendment claim appears to relate to the fact that Judge Fudeman ordered that his Berks County case proceed to mandatory arbitration rather than to a jury.

Martinez has failed to point to any evidence in the record showing that RAWA interfered with his Seventh Amendment rights.  Martinez did not have a Seventh Amendment right to a jury trial in Berks County because "[t]he Seventh Amendment . . . governs proceedings in federal court, but not in state court."  *Gasperini v. Center for Humanities*, 518 U.S. 415, 432 (1996).  In addition, it appears that Martinez misunderstands the mandatory arbitration procedure in the Pennsylvania Courts of Common Pleas because he believes that he would not have the opportunity to present the case to a jury.  Presuming that Martinez included a proper jury demand with his complaint in the Berks County action, if he filed an appeal from the arbitrators' award, he could have proceeded to a jury trial.  *See* Pa. R. Civ. P. Nos. 1308-1311; Berks Cty. Loc. R. Civ. P. 1308 (describing procedure for appealing from mandatory arbitration award). Regardless, Martinez's failure to substantiate his Seventh Amendment claim warrants the entry of summary judgment in RAWA's favor on this claim.[58]

---

[58] To the extent that Martinez contends that RAWA and Judge Fudeman conspired to deprive him of his Seventh Amendment rights, there could be no conspiracy since he lacked a Seventh Amendment right to a jury trial in the Berks County action.  In addition, Martinez has pointed to no evidence in the record to support a claim that RAWA and Judge Fudeman conspired to do anything unlawful (or anything at all for that matter).

f.    Martinez's Claim Under the Eighth Amendment

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  While yet again unspecified by Martinez, it appears that he could be complaining about the two turn on/off fees and the tampering fee RAWA charged him.

To succeed on his Eighth Amendment claim, Martinez would have to prove that (1) the above-referenced fees were "fines" as defined by the Eighth Amendment, and (2) that the fines are excessive.  *See Wright v. Riveland*, 219 F.3d 905, 915 (9th Cir. 2000) (citing *Austin v. United States*, 509 U.S. 602, 622 (1993)).  With regard to the first inquiry, Martinez has not identified and this court has not located any case in which a court determined that an entity such as RAWA, which provides water services and other public services to citizens, issues "fines" when it charges customers fees for turning on and off their water service or when it discovers that a water meter has been "compromised."  Nonetheless, these fees could only constitute "fines" if their purpose is at least "in part to punish." *Austin*, 509 U.S. at 610.  The fees must not be able to "fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes."  *Id.* (internal quotation marks and citation omitted).

Martinez has pointed to no evidence and submitted no argument that RAWA's fees have a purpose at least in part to punish.  Martinez has attached to his affidavit a copy of the letter RAWA sent him in which it charged him $560.00 because of the compromised meter.  *See* Martinez RAWA Aff. at Ex. G.  Attached to the letter is RAWA's policy on damaged meters, and it states that

> If any meter owned by the Authority that is installed in a property owned by a customer of the Authority is lost, stolen, or damaged while in the custody of such customer, such customer shall be responsible for the cost of the repair or

> replacement of such meter, regardless of whether the loss, damage or theft was a result of the negligence of the customer, an unavoidable circumstance or the act of a third party trespasser or criminal.

*Id.* There is nothing about this justification for the fee that expressly or impliedly relates to punishment.

In addition, as to the turn on/off fees, there is no evidence in the record that those fees have a purpose in part to punish. It appears that RAWA charged him the fees simply because it had to turn off his water on two occasions. Nonetheless, it is possible that there is an intent to punish insofar as RAWA informed Martinez that if he did not let it into his home to check his water meter, it would have to turn off his water (and charge a turn off fee). Arguably, that position could compel an individual to let them into the home to change the water meter to avoid the turn off fee (and eventual turn on fee).

Even if somehow the aforementioned fees could constitute "fines" under the Eighth Amendment, Martinez has introduced no evidence to show that they are excessive. A fine is excessive if it is "grossly disproportional" to the gravity of the offense. *See United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (holding in the civil forfeiture context that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense"). While not necessarily determinative of the excessiveness issue, Ruotolo supplied an affidavit in which she indicated that all of the charges to Martinez's account were usual and customary in accordance with RAWA's rates and charges. Ruotolo Aff. at ¶ 3. Although Martinez disputes this assertion, he has introduced no evidence to show that he was not charged in a usual and customary manner; instead, he baldly asserts this fact. Martinez has failed to produce any evidence to support a finding that the fees are grossly disproportional.

Accordingly, the court finds that RAWA is entitled to summary judgment on Martinez's Eighth Amendment claim.[59]

g.     Martinez's Fourteenth Amendment Claims

Section 1 of the Fourteenth Amendment provides as follows:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV, § 1.

Martinez appears to assert both a due process and equal protection claim in this case. With regard to his equal protection claim, it appears that Martinez is asserting that RAWA treated him differently than White citizens with regard to how it charged him. Martinez has not identified the precise nature of this claim. It is possible that he is invoking the "'class of one' theory," which provides that a plaintiff "states a claim for violation of the Equal Protection Clause when he 'alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To the extent that Martinez is asserting a "class of one" claim, he must allege and prove that "(1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Id.*

Although this court is at the summary judgment stage and, as such, is not merely concerned with the sufficiency of the allegations in the complaint, Martinez has still failed to

---

[59] As indicated earlier, it is unclear whether the Eighth Amendment would apply to the fee schedule of a municipal water authority.

support any "class of one" claim because he has not shown that RAWA treated him differently than others similarly situated. Those similarly-situated individuals would be other RAWA customers. Other than pure speculation, Martinez acknowledges that he does not have evidence that he has been treated any differently. *See* Martinez Dep. at 92-93. Therefore, this claim fails and RAWA is entitled to summary judgment to the extent that Martinez has asserted an equal protection claim.[60]

With regard to Martinez's due process claims, "[t]he core of due process is the protection against arbitrary governmental action and has procedural and substantive components." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 399 (3d Cir. 2000) (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998)). Martinez has not stated whether he is asserting a substantive or a procedural due process claim (or both) in this case. During his deposition, Martinez claims that he was deprived of due process during his March 2016 hearing with Judge Fudeman insofar as she allegedly deprived him of a full hearing and his right to cross-examine witnesses.[61] *See* Martinez Dep. at 93.

Despite the court's uncertainty, it appears as if Martinez is complaining about the fact that RAWA charged turn off/on fees and a fee because the water meter was compromised, that RAWA had to and sought to change his meter, and that RAWA turned off his water.[62] Thus, it appears that Martinez is complaining that RAWA's instances of shutting off his water for nonpayment (or for nonpayment after purportedly receiving payment) or for him not agreeing to

---

[60] Although highly doubtful that such a claim is viable against RAWA because it does not appear to be enforcing an ordinance or law (at least according to the evidence in the record), Martinez also could not prevail on an equal protection selective enforcement claim because he failed to point to evidence that he was treated differently than similarly situated individuals. *See Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (setting forth elements for selective enforcement claim).

[61] With respect to PMD, Martinez also indicated that he "think[s] that due process is being violated by every act that they engage in, because they know they're not doing -- they're doing something that's not . . . legal . . . and that alone is, you know, violating my due process right." Martinez Dep. at 96.

[62] As should be evident by the prior portions of this opinion, it is very difficult to interpret Martinez's precise claims because surrounding all of them are his allegations relating to his litigation in Berks County and his wide-ranging conspiracy claims.

allow RAWA to change his meter (or even perhaps for the charging of turn on/off fees),

constitutes an unconstitutional deprivation of his property "regardless of the procedural

safeguards installed." *Ransom v. Marrazzo*, 848 F.2d 398, 411 (3d Cir. 1988).  Such a claim

"represents a substantive due process challenge." *Id.*

To succeed on a substantive due process claim, Martinez must show: "(i) defendants

acted under color of law; (ii) a protected property or liberty interest was at stake; (iii) the

defendants had a duty of care toward the plaintiff; and (iv) a deprivation within the meaning of

the due process clause occurred." *Roberts v. Mentzer*, 382 F. App'x 158, 166 (3d Cir. 2010) (per

curiam).  In this case, even if Martinez shows that RAWA acted under color of law, he cannot

show that a protected property or liberty interest was a stake.  More specifically, "[t]he provision

of water and sewer services, whether by a municipality or by a private utility company, is not[] . .

. a federally protected right."  *Ransom*, 848 F.2d at 411-12 (citation omitted) (alterations to

original); *see also Agarwal v. Schuylkill Cty. Tax Claim Bureau*, No. 3:CV-09-1921, 2010 WL

5175129, at *5 (M.D. Pa. Aug. 26, 2010) ("Under *Ransom v. Marrazzo*, 848 F.2d 398, 412 (3d

Cir. 1988), Plaintiffs have no constitutional right to use and enjoy a municipality's water

services.").  Furthermore,

> [t]he legal fact that, once a municipality (or, for that matter, a private utility
> company) establishes a utility for its citizens, a citizen's expectation of receiving
> that service rises to the level of a property interest cognizable under the Due
> Process Clause, *Memphis Light*[, *Gas and Water Div. v. Craft*], 436 U.S. 1, 98
> S.Ct. 1554, 56 L.Ed.2d 30; *Koger*[ *v. Guarino*, 412 F. Supp. 1375, 1386 (E.D. Pa.
> 1976), *aff'd*, 549 F.2d 795 (3d Cir. 1977)], merely brings that expectation within
> the compass of the Fourteenth Amendment's procedural protections, measured
> according to the *Mathews v. Eldridge* analysis.  It does not transform that
> expectation into a substantive guarantee against the state in any circumstance.
> Therefore, we reject the claim that conditioning the receipt of water and sewer
> service on the satisfaction of past due charges for services rendered to the
> applicant's residence raises the question of a substantive due process deprivation.

*Id.* at 412.[63]

Since Martinez does not have a protected liberty or property interest at stake in this case, summary judgment in favor of RAWA on Martinez's substantive due process claim is proper.[64]

h.      Martinez's Section 1981 Claim

For the same reasons already discussed regarding Martinez's section 1981 claim against PMD, he may not maintain this claim against RAWA, a state actor.[65]

---

[63] Regarding the decision in *Mathews*,

> an individual must ordinarily be afforded "the opportunity to be heard 'at a meaningful time and in a meaningful manner'" before any such intrusion [of the individual's protected interests]. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965)). The extent of that obligation is, as the Supreme Court has instructed, a flexible one, based upon a balance of several factors:
>
> > First, the private interest that will be affected by the official actions; second, the risk of an enormous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
>
> *Id.* at 335, 96 S.Ct. 893.

*B.S. v. Somerset Cty.*, 704 F.3d 250, 271 (3d Cir. 2013) (citing *Croft*, 103 F.3d at 1125).
      The court notes that Martinez does not assert that he lacked to the opportunity to be heard, and in fact he had engaged in RAWA's internal review process when he filed a complaint about the two turn off/on fees. Moreover, he does not assert that he suffered from a defective predeprivation process; rather, he focuses on the conduct of RAWA in seeking to turn off his water. He always received notice before RAWA turned off his water, and he has not alleged that Pennsylvania law fails to provide an adequate postdeprivation remedy for him. *See County of Sacramento v. Lewis*, 523 U.S. 833, 840 n.4 (1998) ("Respondents do not argue that they were denied due process of law by virtue of the fact that California's post-deprivation procedures and rules of immunity have effectively denied them an adequate opportunity to seek compensation for the state-occasioned deprivation of their son's life." Martinez has not identified either a constitutionally defective procedure which purported to authorize RAWA's actions, or a lack of an adequate postdeprivation remedy to the extent that he believes that RAWA's acts were unlawful.
[64] The court also notes that the charging of a turn on/off fee (and the circumstances in which RAWA charged the fee in this case), the charging of a fee due to a compromised water meter, and even the water shut offs which appear to have occurred due to either (1) nonpayment of an outstanding balance or (2) Martinez's refusal to allow RAWA to check his water meter, are not so egregious as to shock the conscience.
[65] Martinez has also failed to introduce any evidence of racial discrimination on behalf of RAWA.

### 3. Martinez's Causes of Action Under the Pennsylvania Code in Count III of the Complaint

Both defendants contend that the court should enter summary judgment in their favor as to Count III of the complaint, which purports to allege claims for violations of various provisions of the Pennsylvania Administrative Code/Public Utilities Code. RAWA Br. at 16; PMD Mem. at 38. PMD argues that (1) it is not a public utility subject to the Public Utilities Code, (2) the referenced code provisions deal with the provision of water and PMD does not provide water to the citizens of Reading, and (3) there is no evidence that PMD had any involvement in RAWA's decision to terminate Martinez's water service. PMD Mem. at 38. RAWA argues that the cited Code provisions do not apply to it because it was organized under the Municipal Authorities Act and is governed by that Act. RAWA Br. at 16. In addition, RAWA contends that PUC does not regulate municipal authorities such as RAWA. *Id.* (citations omitted). Martinez has not addressed PMD's arguments in his submissions, although as discussed below, he does contend that PUC governs RAWA. *See* Pl.'s RAWA Resp. at ¶ 2 & Ex. A.

Preliminarily, there is an issue now that the court has indicated that summary judgment will be entered on Martinez's federal claims because only state law claims remain. In circumstances where a district court is exercising supplemental jurisdiction over state law claims, the court

> "may decline to exercise supplemental jurisdiction" if the court "has dismissed all claims over which it has original jurisdiction." [28 U.S.C.] § 1367(c)(3). . . . [I]n most cases, pendent state law claims should be dismissed without prejudice "where the claim over which the district court has original jurisdiction is dismissed before trial." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995). On the other hand, "[w]here the original federal jurisdiction claim is proceeding to trial … considerations [of judicial economy, convenience, and fairness to the parties] will normally counsel an exercise of district court jurisdiction over state claims based on the same nucleus of operative facts." *Id.*

*Cindrich v. Fisher*, 341 F. App'x 780, 789 (3d Cir. 2009) (per curiam).

In this case, the matter has been pending before the court for approximately 18 months and the parties have filed all of the pertinent documents as if the case was going to trial. Martinez's state law claims are based on the same conduct (at least with regard to RAWA) as supported the federal claims. Even though the court is entering summary judgment in favor of the defendants for the causes of action of which this court has original jurisdiction, the court finds that the considerations of judicial economy, convenience, and fairness to the parties compels the court to continue to exercise supplemental jurisdiction over Count III of the complaint. As such, the court will address the defendants' motions for summary judgment on this claim.

In the third count of the complaint, Martinez attempts to assert causes of action for violations of 52 Pa. Code §§ 56.83, 56.321, 56.331, 56.334, 56.340, and 65.8.[66] These sections provide as follows: Section 56.83 provides instances where public utilities are not permitted to terminate utility services to a customer. Section 56.321 provides for instances where a residential utility service may terminate service. Section 56.334 sets forth procedures for utility employees to follow immediately prior to terminating service. Section 56.340 provides for procedures for utility terminations in the winter. Finally, section 65.8 provides a variety of requirements for meters.

Martinez has not provided the court with any basis pursuant to which PMD could be liable under the provisions of the aforementioned Pennsylvania Code because (as argued by

---

[66] In the first instance, it is questionable as to whether sections 56.321, 56.331, 56.334, and 56.340 apply to this case. These sections are contained in Title 52, Chapter 56, Subchapter P. Subchapters "L--V apply to victims under a protection from abuse order" and certain "wastewater, steam heating and natural gas distribution utilities with annual gas operating revenues of less than $6 million per year." 52 Pa. Code § 251; *see* 52 Pa. Code § 56.1(b) ("[Subchapter A] and Subchapters B--K apply to electric distribution utilities, natural gas distribution utilities and water distribution utilities. Subchapters L--V apply to wastewater utilities, steam heat utilities, small natural gas utilities and to all customers who have been granted protection from abuse orders from courts of competent jurisdiction."). RAWA appears to provide wastewater and water distribution to the City of Reading; thus, if these provisions are applicable to RAWA, it is unclear which set of provisions would apply.

PMD) (1) it is not a public utility subject to the Public Utilities Code, (2) the referenced code provisions deal with the provision of water and PMD does not provide water to the citizens of Reading, and (3) there is no evidence that PMD had any involvement in RAWA's decision to terminate Martinez's water service. PMD is therefore entitled to summary judgment on Count III of the complaint.

As for RAWA, Martinez disputes RAWA's assertion that the PUC does not regulate it. *See* Martinez RAWA Aff. at ¶ 2 and Ex. A. Martinez's evidence in support of his opposition appears to be a print out from a website which states that the Commission "is statutorily mandated to supervise all public utilities in the Commonwealth of Pennsylvania. Those utilities include electric, telephone, gas, water, railroads and motor carriers." *Id.* at Ex. A.

Despite Martinez's assertions to the contrary, it appears that the PUC does not regulate RAWA. *See, e.g.*, *Chester Water Auth. v. Pennsylvania Public Util. Comm'n*, 868 A.2d 384, 392 (Pa. 2005) (explaining that "the PUC lacks regulatory control over services by and rates charged by municipal authorities"); *Municipal Auth. of Borough of West View v. Public Util. Comm'n*, 41 A.3d 929, 934 (Pa. Cmwlth. 2012) (noting that PUC claimed that it did not regulate a municipal authority in addressing a standing issue); *Graver v. Pennsylvania Public Util. Comm'n*, 469 A.2d 1154 (Pa. Cmwlth. 1984) (affirming PUC's dismissal, for lack of PUC's jurisdiction, a complaint by developers that a water authority created under the Municipality Authorities Act of 1945 wrongfully disconnected water meters because PUC lacked "jurisdiction to determine questions of the reasonableness of rates fixed or of the services provided by a municipal authority beyond the limits of the municipality"); *In re Heckman*, 560 B.R. 657, 661 (Bankr. E.D. Pa. 2016) (explaining that litigant filed informal complaint with the Pennsylvania Public Utilities Commission, asking it to direct RAWA to "investigate his situation to determine if the excessive water consumption was caused by a defective meter or other equipment causing the water meter

to malfunction," and the Commission responded by "stating that it does not regulate municipal authorities"). Accordingly, Martinez may not maintain a claim against RAWA in Count III and RAWA is entitled to summary judgment on this count as well.

## III. CONCLUSION

Martinez has failed to show that there are any genuine issues of <u>material</u> facts that would preclude the entry of summary judgment in favor of the defendants in this case. With regard to PMD, it does not appear that it is a person subject to suit under section 1983, but even if it was (or if the court allowed Martinez to amend the complaint and substitute the City of Reading as a defendant), Martinez has not identified any unlawful policy or custom that violated his constitutional rights such as to establish liability of PMD under *Monell*. In addition, to the extent that Martinez is asserting conspiracy claims under section 1983 or even 1985(3), he has failed to, *inter alia*, produce any evidence of an agreement by RAWA and PMD, between themselves or with others. Moreover, Martinez may not maintain a section 1981 claim against PMD because it is a governmental entity and section 1983 is the only vehicle for relief against such a defendant. Finally, Martinez has failed to show that PMD is governed by his referenced provisions of the Pennsylvania Utilities Code as to allow him to proceed against PMD in Count III of the complaint.

As for RAWA, Martinez has failed to produce evidence or show that there is a genuine issue of material fact that would preclude summary judgment on his section 1983 claims under the First, Second, Fourth, Fifth, Seventh, Eighth, and Fourteenth Amendments. In addition, as with PMD, Martinez cannot proceed in his section 1981 claim against RAWA in Count II of the complaint. Finally, he cannot proceed on his claim in Count III because the Pennsylvania Code provisions do not apply to RAWA insofar as its municipal authority status takes it out of governance by the PUC.

Accordingly, since there are no genuine issues of material fact that would preclude the entry of summary judgment as a matter of law in favor of the defendants, the court will grant the motions for summary judgment.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.